[Crim. No. 1345. Second Appellate District, Division One.—June 17, 1926.]

## THE PEOPLE, Respondent, v. BENJAMIN MORHAR, Appellant.

[1] CRIMINAL LAW—ARSON—DESTROYING INSURED PROPERTY—VERDICT —EVIDENCE.—In this prosecution for arson and destroying insured property, while the evidence against defendant is circumstantial, and not direct, it is sufficient to sustain the verdict finding him guilty.

[2] ID.—ARSON—DEGREE OF—PLEADING.—In an information or indictment charging arson, in the language of section 447 of the Penal Code, it is not necessary that such information shall state in what degree the crime was committed, the question of degree being

---

2. See 3 Cal. Jur. 167.

for the jury to determine from all the facts and circumstances developed in evidence.

[3] ID.—OCCUPATION OF BUILDING—INFORMATION—SUFFICIENCY OF—SECTION 452, PENAL CODE.—The statement in the information charging arson that the building alleged to have been set on fire was "then and there occupied by" a certain named person, a human being, was a sufficient compliance with the requirements of section 452 of the Penal Code, which provides: "To constitute arson it is not necessary that a person other than the accused should have had ownership in the building set on fire. It is sufficient that at the time of the burning another person was rightfully in possession of, or was actually occupying such building, or any part thereof."

[4] ID.—PRESERVATION OF PROPERTY OF RELIGIOUS SIGNIFICANCE TO DEFENDANT—EVIDENCE—RECORD.—In such prosecution, assuming that the defendant had the right to offer evidence tending to prove that by reason of certain religious beliefs and feelings, he would have been moved to preserve rather than to destroy property of religious significance to him which was in the house at the time of the fire, prejudicial error was not committed in regard to such evidence, where the essential answers (showing the character and meaning to defendant of such religious property) were given before the objections to the questions were made and sustained, and there was no order striking from the record the answers thus given.

[5] ID.—WITNESS — STIPULATION — CONTINUANCE — APPEAL. — In such prosecution, the defendant may not be heard to complain that certain witnesses were not permitted to testify in his behalf, where a stipulation was entered into whereby the court allowed a continuance upon agreement of defendant's counsel that he would not introduce the testimony of the very witnesses to the exclusion of whose testimony he objects on appeal.

[6] ID.—APPEARANCE OF WITNESSES—CONTINUANCE—DISCRETION.—If attorneys direct witnesses that they need not appear until a certain time, and the court is ready to receive their evidence before that time, it is within the discretion of the trial court to refuse a continuance requested for the purpose of producing those witnesses.

[7] ID.—CONVERSATIONS—IMPEACHMENT—EVIDENCE.—In such prosecution, where the defendant had admitted some portions of certain conversations and had denied other portions, it was proper for the prosecution to impeach defendant's statements as to the portions of the conversations denied by him, and there was no prejudicial error in permitting impeaching questions as to the portions of the conversations admitted by defendant.

[8] ID.—CONVERSATION BETWEEN DEFENDANT AND WIFE—PRESENCE OF POLICE OFFICERS—PRIVILEGED COMMUNICATIONS—In such prosecution, the fact that police officers were present when a certain conversation took place between defendant and his wife deprived the conversation of standing as a privileged communication.

[9] ID.—OVERHEARING CONFIDENTIAL COMMUNICATION—TESTIMONY CONCERNING.—A third person overhearing a confidential communication may testify to it, for the same reason recognized in the privilege of a client's communication with his attorney.

[10] ID.—REMARKS OF TRIAL JUDGE—MISCONDUCT.—In such prosecution, a reversal will not be ordered because of alleged misconduct on the part of the trial court in making certain remarks in the presence of the jury, where the remarks were pertinent to the situation presented and were not such as to constitute misconduct.

(1) 5 C. J., p. 555, n. 32, p. 580, n. 17; 16 C. J., p. 762, n. 31, 32. (2) 5 C. J., p. 559, n. 97, 98, 99, p. 584, n. 71 New; 31 C. J., p. 670, n. 33. (3) 5 C. J., p. 546, n. 6, p. 562, n. 48, p. 567, n. 24. (4) 17 C. J., p. 335, n. 9, p. 337, n. 27. (5) 17 C. J., p. 209, n. 85, 86. (6) 16 C. J., p. 451, n. 90, 91, p. 458, n. 75, 76. (7) 17 C. J., p. 312, n. 44, p. 314, n. 69, p. 315, n. 73; 40 Cyc., p. 2687, n. 93, p. 2699, n. 35. (8) 40 Cyc., p. 2359, n. 58, 64. (9) 40 Cyc., p. 2359, n. 65. (10) 16 C. J., p. 828, n. 20, p. 829, n. 34; 17 C. J., p. 295, n. 63.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. Charles Monroe, Judge. Affirmed.

The facts are stated in the opinion of the court.

Page, Nolan, Rohe & Hurt for Appellant.

U. S. Webb, Attorney-General, John W. Maltman, Deputy Attorney-General, and James S. Howie for Respondent.

YORK, J.—This is an appeal from a judgment of the superior court of Los Angeles County, and from an order denying a motion for a new trial. The appellant was convicted under two counts; the first of first degree arson, the

9. Testimony as to privileged communication overheard by third person, see notes in 10 Ann. Cas. 179; 29 Am. St. Rep. 414; L. R. A. 1917D, 281; 33 L. R. A. (N. S.) 485. See, also, 27 Cal. Jur. 48; 28 R. C. L. 520.

second of destroying insured property, the crime specified in Penal Code, section 548.

The evidence is clearly sufficient to establish the fact that arson of the first degree was committed by someone in the burning of the house. At the time of the fire the house was occupied solely by the defendant and his wife and two young children. The fire occurred in the early morning, between 2 and 3 o'clock. It may be assumed, as was indicated, that the family had been several hours in bed. The house doors were locked. In escaping from the house the occupants closed the doors, which locked them, the locks being spring-locks. This was proved by the firemen, who were obliged to break open the doors. The defendant was found among the persons assembled outside the house. He was barefooted at the time. Later defendant obtained and put on a pair of shoes, and went with officers to the police station. The shoes carried an odor of kerosene. The officers called his attention to this fact, but he replied that the smell was like turpentine. At that time, according to the testimony of the witness Larimer, defendant said that he had only one pair of shoes. But at the trial defendant testified that the shoes to which the officers referred were used by him in working around the yard, and that he had not worn them the day before, but had worn another pair. This inconsistency in his statements derived its importance from the fact that at the time of the fire it was found that rags and other articles within the house and on the floor had been soaked with kerosene. If the jury believed that the defendant testified falsely concerning the shoes which he had worn in the house, such false testimony, under the circumstances, had a direct tendency to show guilty knowledge concerning the fire. The defendant and his wife were owners of the house and furniture, both of which were heavily insured. [1] Without further review of the evidence (all of which, however, we have examined), we conclude that while the evidence against appellant is circumstantial, and not direct, it is sufficient. In this respect it is analogous to that produced in *People* v. *Tom Woo*, 181 Cal. 315, 328 [184 Pac. 389, 394], where the supreme court said: "It is the law that neither mere opportunity to commit a crime, nor perjured testimony is sufficient to support a verdict of guilty. Nor are false statements or suspicious circumstances sufficient. It may be

conceded that no one of the facts summarized would, if standing alone, be sufficient to uphold the verdict, but when all the circumstances which the jury may have resolved from the evidence are considered together, it cannot be held on appeal that they are not sufficient to warrant an inference of guilt."

The information in the first count charged that the defendant, at the time and place stated, did wilfully, etc., set on fire and burn the described building "then and there occupied by one Elizabeth Morhar, a human being, with intent to destroy the same." The information failed to specify that the burning was done in the night-time. The verdict of the jury as applied to this count found the defendant "guilty of arson, a felony, and we find it to be arson of the first degree as charged in count one of the information."

Appellant contends that the verdict is contrary to law, in that said first count of the information does not charge the public offense of which the defendant was convicted, to wit, arson of the first degree. The two reasons assigned for this contention are that the information did not charge that the burning occurred in the night-time, and that the information did not charge the burning of an inhabited building. [2] In an information or indictment charging arson, in the language of section 447 of the Penal Code, it is not necessary that such information shall state in what degree the crime was committed. "That is for the jury to determine from all the facts and circumstances developed in evidence." (*People* v. *Russell*, 81 Cal. 616 [23 Pac. 418].) Section 452 of the Penal Code reads as follows: "To constitute arson it is not necessary that a person other than the accused should have had ownership in the building set on fire. It is sufficient that at the time of the burning another person was rightfully in possession of, *or* was actually occupying such building, or any part thereof. [3] The statement in the information that the building was "then and there occupied by one Elizabeth Morhar, a human being," was a sufficient compliance with the requirements of section 452. There was no demurrer to the information, nor was any claim asserted by defendant in the court below that the information was subject to any legal objection. We think that the information sufficiently set forth in said count one

a charge of arson under which a conviction of arson in the first degree may be sustained. And the evidence shows that in fact the fire occurred in the night-time, and that the house was then and there inhabited and actually occupied by Mrs. Morhar, as well as by the defendant and by their two children. That the wife and children were not technically "in possession" of the property is, under such circumstances of occupancy, an immaterial fact.

[4] In the third point raised by appellant he claims that certain evidence offered by him was erroneously excluded, to his prejudice. It is argued that this evidence was offered for the purpose of showing not only that there was lack of motive for the defendant to commit the crime, but that it would be very improbable that he would have burned the house without taking the precaution of first removing certain sacred relics which were kept in the house. The defendant testified that "I had the Ten Commandments and a few things, you know. . . . I kept it with me all the time. Q. What does it mean to you? A. It means a whole lot." On objection that this called for a conclusion of the witness the objection was sustained. "Is it part of your religion or—" "Same objection." "Objection sustained." The witness then testified that he had also wanted to get from the house, beside The Ten Commandments, a "taless," which was a present made him when he was married.

"Q. Has it any significance in your religion? A. Yes."

Following the answer, this was objected to as incompetent, irrelevant, and immaterial and objection sustained. The attorney for defendant then said he wanted to produce this article and intended to prove further by competent witnesses what such a thing means to a man of that type. Although the judge then stated that he did not believe such evidence competent, it was not offered at that time, nor does it appear that such evidence was offered later. The following is the only additional evidence to which we are referred on this point: "Q. How old were those commandments? A. About one hundred years." Following the answer, the district attorney objected to this as incompetent, irrelevant, and immaterial. The Court: "Objection sustained." "Q. How old was this taless, you speak of? A. About one thousand years." District Attorney: "Same objection." The Court: "Objection sustained." Assuming that under

the circumstances of this case the defendant had the right to offer evidence tending to prove that by reason of certain religious beliefs and feelings, he would have been moved to preserve rather than to destroy property of religious significance to him which was in the house at the time of the fire, nevertheless we think that this record does not show prejudicial error. The essential answers were given before the objections to the questions were made, and there was no order striking from the record the answers thus given. Practically, if not technically, they remained before the jury, without any instruction that such evidence be disregarded. We think it is not reasonable to conclude that the rulings, made in the manner stated, and of which appellant complains, had any important influence against the defendant.

[5] A stipulation was entered into which apparently covers the entire objection on the exclusion of certain witnesses. The stipulation referred to being the stipulation whereby the court allowed a continuance of several hours, in order that defendant might obtain the evidence of two witnesses. This was done upon agreement of counsel for the defendant that he would not introduce the testimony of the very witnesses to the exclusion of whose testimony he is now objecting. [6] If attorneys direct witnesses that they need not appear until a certain time, and the court is ready to receive their evidence before that time, we think it is within the discretion of the trial court to refuse a continuance requested for the purpose of producing those witnesses. The witnesses referred to as being excluded were not on hand to testify when their evidence was offered, and it appears from the record that they were not offered again as witnesses and the record does not show if they were ever present when the jury was in the box.

[7] The fourth objection of appellant is that certain attempted impeachment of defendant's testimony was improper and irregular. In laying the foundation for impeachment the district attorney asked the defendant whether at a certain time and place, and in the presence of certain parties, he had stated certain things. In reply the defendant had admitted some portions of the conversations, had been evasive as to others and denied other parts or portions of the conversations *in toto;* and yet when the People put on their evidence impeaching the statements of the defend-

ant they did not limit such so-called impeachment to the portion of the conversation denied, but asked as to each and all of the so-called conversations. The defendant objected on the ground that there was therefore no proper foundation for the so-called impeaching questions. However, we hold that it was proper to ask as impeaching questions the questions as to conversations, which had been propounded to the defendant and which he had denied. As to the other questions propounded, the answers of the so-called impeaching witness were not contradictory to those of the defendant, and were not such that the error in admitting them resulted injuriously to the defense.

[8]   The objection that certain conversation was a privileged conversation between defendant and his wife is answered by the very statement in the brief of the appellant wherein it shows that certain police officers were present when the conversation took place. This would deprive the conversation of standing as a privileged communication. [9]   "A third person overhearing a confidential communication may testify to it, for the same reason recognized in the privilege of a client's communication with his attorney." (Wigmore on Evidence, sec. 2339.) Also, see cases cited in such section and section 2326. Also, 40 Cyc. 2359; Ann. Cas. 1918A, 441; *People* v. *Swaile,* 12 Cal. App. 192 [107 Pac. 134].

[10]   As a fifth objection it is claimed that there was misconduct on the part of the court in making certain remarks in the presence of the jury. Such remarks were called forth by the nature of the examination conducted by the attorney in summoning witnesses for a certain time and excusing such witnesses from obeying such summons, thus placing the court in such a position that it could not punish witnesses for contempt for not appearing at the time specified in the subpoena served upon them. The remarks made by the judge were pertinent to the situation presented, and were not such as to constitute misconduct.

An examination of the entire record in this case fails to disclose any error that has in any way resulted in a miscarriage of justice.

The judgment and order are affirmed.

Conrey, P. J., concurred.

HOUSER, J., Dissenting.—I dissent.  Particularly am I unable to concur in the conclusion stated in the majority opinion that the jury was uninfluenced by reason of the rulings made by the trial court in the matter of the attempt on the part of defendant to prove the significance to him of several articles intimately connected with his religious belief.

At the outset, it may be well to consider the fact that the evidence directly connecting defendant with the commission of the offense of which he was charged was very weak.  As indicating the opinion of the judge of the trial court with reference thereto, it appears that at the conclusion of the case for the prosecution, after defendant had made a motion that the court advise the jury to acquit the defendant, the judge made several statements to the attorneys representing the respective parties to the controversy, which remarks clearly show that he was extremely loath to submit the case to the jury.  Among the expressions by the judge of the trial court are the following:

"The Court: I think I will hear from the other side.  It seems to me that all you have here is a suspicion. . . . I am free to say that I have a suspicion, but I am bound to instruct the jury that they cannot bring in a verdict against the defendant on suspicion. . . . The testimony put in is very suspicious, but if it is true and correct I don't see why it could not just as well have been his wife as the defendant. . . . I don't want to criticise you (the district attorney) at all, or the district attorney's office, for going on with the prosecution. . . . but no matter what my suspicions may be, I cannot allow the case to go to the jury simply on suspicions. . . . if the jury convicted him (defendant) on that evidence, I would set it aside. . . . I don't believe, Mr. Works (deputy district attorney), I would be justified in going on.  Of course, all I can do is to advise the jury.  I suppose you (attorney for defendant) don't want to put in any evidence?"

With so much of a concurrence in the thought that the evidence of defendant's guilt as presented by the prosecution was of the weakest character, the question of the effect which any erroneous rulings, either in the admission of evidence against the defendant or in the rejection of evidence

presumably in his favor, assumes an aspect of the greatest importance. Dealing, then, with one of the propositions discussed in the majority opinion; that is to say, the third point raised by appellant to the effect that certain evidence offered by him was erroneously excluded by the trial court—the reporter's transcript of the proceedings had on the trial shows that he is of the Jewish religious faith and that he followed "most all" of the religious rites and customs prescribed by his religion; that inside the house which was burned (although not entirely destroyed) defendant kept "the ten commandments," a "flag" and a silver "taless," the last of which being a present made to him by his father-in-law on the day of defendant's marriage; that "the ten commandments" was a religious relic about one hundred years old, and that the "taless" (also a religious relic) was about a thousand years old. As appears by the statement made in the majority opinion of this court, although defendant technically testified to the foregoing facts, objections by the prosecutior to questions relating thereto were continually sustained by the judge of the trial court. His attitude with reference thereto was distinctly hostile, undoubtedly insinuating into the minds of the members of the jury the impression that such evidence was of no consequence and unworthy of consideration. Evidence as to the significance of such objects to defendant, or to anyone of the Jewish faith, was entirely excluded by the trial court. For example:

"Q. To defendant (by Attorney Murphy): Do you have any particular collects that are essential elements of your faith or religion?

"Mr. Works (attorney for the people): Objected to as immaterial.

"The Court: Objection sustained. You went all over that the other day" (which last remark was in fact incorrect).

A reference to the reporter's transcript of the proceedings had on the trial of the action will illustrate the attitude of the trial court with relation to all such evidence:

"Mr. Murphy (attorney for defendant): I have it (the taless) here. I want to produce it. I intend to prove further on by competent witnesses what such a thing means to a man of that type.

"The Court: I don't believe that is competent.

"Mr. Murphy: I think it is.

"The Court: I don't think so.

"Mr. Works (attorney for the people): I certainly object to it.

"The Court: Objection sustained."

The judge of the trial court also refused to permit defendant to introduce a witness (a Jewish rabbi) who, it is asserted by counsel for defendant, was the rabbi of the Jewish Synagogue to which defendant belonged, and who was thoroughly qualified and competent to testify concerning the religious significance and value of the various relics which theretofore had been mentioned as having been left by defendant in the house at the time the fire started; that the rabbi would have testified to the effect that the relics in question were of such importance to the average Jewish layman that they were necessary accessories to all forms of prayer, and that the Jewish layman without these relics does not believe his prayers will reach the ears of the Deity to whom they are directed; and that the rabbi would have testified further that the orthodox Jew would rather lose his life than lose those relics.

The materiality of evidence with reference to the religious faith of defendant in each of the particular religious "collects" or "relics" which it was shown were in the house at the time it was burned, and the significance particularly attachable to such religious "relics" by an orthodox Jew, becomes apparent on consideration of the question of motive. Prior to the attempt or attempts on the part of defendant to introduce such evidence, the prosecution had endeavored to show motive in that the house which was burned was overinsured. Defendant was permitted to make some rebuttal of the facts advanced by the prosecution in support of that particular proposition; but in reason it is clear that defendant should not have been limited to a mere contradiction, in terms or otherwise, of the essential facts introduced by the prosecution which in the judgment of the district attorney tended to show motive in the defendant for the commission of the crime. The showing of motive was not a necessary element in the guilt of defendant. That was an incidental issue injected into the case by the prosecution. But having tendered it, such issue was subject to all the rules surrounding any other issue. The prosecution vouchsafed a reason which it was

thought actuated defendant in the commission of the offense. The defendant thereupon had the right not only to show the falsity of the facts suggesting the reason advanced by the prosecution; but as well to show that good reason existed for defendant's abstaining from the commission of the crime. If defendant could have shown that at the time the fire occurred he had ten thousand dollars in currency in his home, and which currency would have been destroyed had defendant not removed it from the house, it could scarcely be doubted that he would have had the right to show such fact as opposing any evidence of motive on his part to burn his home for the insurance money of a much lesser amount which would have become payable to him had his home been destroyed by fire. On the trial of the action, in addition to the specific rebuttal by defendant to which reference has been had, and as tending to show that no motive could exist in him for burning his home, as hereinbefore indicated he made several unsuccessful attempts to show that within the house at the time the fire occurred were these sacred "relics" which, because of his religious belief, were dearer to him than life itself. As an inference therefrom it would seem most reasonable that if defendant had contemplated the burning of his house and that within that home were located certain precious objects of such religious significance that without their possession he could not hope for religious salvation, prior to setting fire to his home he would have taken the precaution to remove such objects to a place of safety. Not having done so, the further inference would follow that he did not set fire to his home. As the admitted evidence stood, that is to say, the mere fact that the religious "relics" were within the house at the time the fire occurred—with no explanation as to their import or significance to defendant— the undoubted effect was to deprive defendant of the benefit of a most substantial portion of his defense. Without an explanation of the significance of the "relics," which meant so much to defendant, they might as well have been so much junk, so far as the jury was concerned, because it cannot be presumed that the members of the jury were, or that any one of them was, versed in matters of that kind or that they or he had even the slightest knowledge of the

bearing which the loss of such "relics" would have upon the issue of motive which had been introduced into the case.

Considering the fact, as expressed by the trial judge, that "all you (the prosecution) have here is a suspicion" of defendant's guilt, it is impossible for me to agree with my brethren of the bench in their statement that the exclusion of the evidence to which reference has been had was of no material consequence and that it had no "important influence against the defendant." To the contrary, to my mind, it manifestly appears that—the extreme weakness of the case against defendant being considered—the probabilities are that had such evidence been admitted, defendant would have been acquitted of the charges preferred against him. Prejudicial error affecting the substantial rights of the defendant having been shown, together with the affirmative conclusion that such error in all probability resulted in a miscarriage of justice, there is no room for the application of the provisions of the constitution (sec. 4½, art. VI) affecting the question at issue. The liberty and good name of defendant were at stake, and in a decision of so great import the defendant should not be obliged to take any more of the "rough chances of the law" than have been thoroughly established and recognized in principle either by existing statutes or by adjudicated cases.

Another matter discussed in the main opinion herein in the conclusion of which I am unable to concur is that with reference to the "stipulation" by which "the court allowed a continuance of several hours in order that defendant might obtain the evidence of two witnesses." The so-called "stipulation" was entered into some time after 11 o'clock in the morning and a recess of the court at that time was taken until the usual time for convening court in the afternoon, to wit, 2 o'clock P. M. So that whatever accommodation, or courtesy, or consideration was involved in the matter (the usual noon recess of two hours being deducted) amounted in reality to something less than one hour's time. It appears that, relying upon the time he thought the introduction of certain evidence would take, one of the attorneys for defendant excused a certain witness until 11 o'clock. As a matter of fact, the taking of the evidence which counsel had in mind occupied less time than he had estimated, with the result that defendant "ran

out of witnesses.'' It is also shown that defendant had subpoenaed three witnesses to appear at 2 o'clock P. M., none of whom was present in court at the time the so-called ''stipulation'' was entered into. Counsel for defendant desired an early recess in order that the witnesses might testify in defendant's behalf. A transcript of a part of the proceedings had with relation thereto is as follows:

''The Court: No, Mr. Dixon (the witness expected at 11 o'clock) I will not wait for. The only stipulation and condition under which I will continue this case until 2 o'clock is that those two women—you told me what they will testify—that those two women will be the only two witnesses you will call at that time; otherwise you will go to the jury now.

''Mr. Ramey (attorney for defendant): Your Honor, it is not our fault.

''The Court: It is your fault that Mr. Dixon is not here. Here comes this man strolling in here and we have been waiting quite a while. . . . In my discretion I will give you time to get these two witnesses, on the condition that you will call no others at that time.

''Mr. Ramey: I think your Honor is laboring under misapprehension as to the facts. We have no agreement with any of those witnesses except Mr. Dixon, who was to be here at 11. All of the other witnesses have been in attendance and have been in the courtroom during the entire trial until this morning, and we didn't know until we called them that they were not here.

''The Court: Mr. Dixon should have been here. He was to be here at 11 o'clock. Now, I don't care to take any further time. Are you willing to stipulate that?

''Mr. Ramey: We have subpoenaed also, your Honor, one witness, the Rabbi.

''The Court: When did you subpoena him?

''Mr. Ramey: Last night.

''The Court: And he is not here.

''Mr. Ramey: He was not subpoenaed to appear until 2 o'clock. That was our fault.

''The Court: Now, I will not allow you to put him on.

''Mr. Ramey: There is nothing more that I can say, your Honor.

"The Court: All right. You have something to say. Will you agree to the court's condition, because if not we are going on now? . . . You don't have to agree to that condition, but unless you do we are going on with the case. . . .

"The Court: We are going on with the rebuttal and the argument, unless you accept my conditions. . . . I am not going to allow Mr. Dixon to testify, and I am not going to let you make me talk much longer in hopes he will be in here. Now, I will ask you now, and I want an answer, do you stipulate to the condition I made?

"Mr. Ramey: Yes, your Honor."

It thus conclusively appears that the so-called "stipulation" was brought about by means of a threat on the part of the judge of the trial court. In order that defendant be permitted to introduce the testimony proposed to be given by two witnesses, he was forced to agree that the testimony which might have been given in his behalf by two other important witnesses be left out of defendant's case. It would seem that a sense of justice or at least a more liberal spirit of fairness to the defendant on the part of the trial judge might have suggested to his mind the inequality of the "stipulation." The case should either have been open for all proper purposes to the defendant or absolutely closed as to his defense. If the trial were to be continued for any reason it is clear that so far as defendant was concerned, all his rights in the premises should have been reserved to him and protected by the trial court. The defendant was either entitled to a short recess of the court, or he was not. If not, the case should have been closed so far as further taking of testimony by the defendant was concerned. If he was entitled to a recess, then it should have been extended to him without the penalty attached thereto of losing some of his valuable rights. At any rate, it is plain that whatever fault was committed, it was not of the defendant personally. If within the judgment of the judge of the trial court some punishment ought to be inflicted, the penalty should have been visited, not upon the defendant personally, but upon the person, if any, who committed the fault. A stipulation is nothing more than a form of agreement, and an agreement which is induced by any form of menace, or by overreaching, or by taking advantage by one of the parties to the agreement of the ne-

cessities of the other, if not absolutely void, certainly is not such a "meeting of the minds" as is contemplated in a court of justice as fair and reasonable, especially where a trial judge in the course of a trial is one of the parties and a helpless litigant, with his back to the wall fighting for his liberty and good reputation, is the other party to the agreement. A stipulation made between such parties and in such circumstances would amount to nothing less than an order of the court. If in the first instance, whether pursuant to a motion made by the district attorney or through the initiative of the judge of the trial court, an order of the character of the "stipulation" here under consideration had been made, its effectiveness from a legal standpoint as affecting the ultimate constitutional and statutory rights of the defendant might well be doubted.

Additional reasons affecting other points raised by appellant might be given for my failure to agree in the judgment herein; but, to my mind, sufficient has been said. By constitutional guaranty the defendant was entitled to a fair trial. In my humble opinion he did not get it.

With the greatest respect for the good judgment of my colleagues on the bench, I cannot agree with their conclusion that justice has been done.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 16, 1926.