[Crim. No. 6093. Second Dist., Div. Three. Aug. 14, 1958.]

THE PEOPLE, Respondent, v. GORDON TRAVIS CAMPBELL, Appellant.

Harold J. Ackerman, under appointment by the District Court of Appeal, for Appellant.

Edmund G. Brown, Attorney General, and Norman H. Sokolow, Deputy Attorney General, for Respondent.

SHINN, P. J.—In a jury trial, Gordon Travis Campbell was convicted of violating Vehicle Code, section 501 (Count I) and Vehicle Code, section 480 (Count II). He appeals from an order granting him probation and the denial of his motion for new trial.

At 12:45 a. m. on February 7, 1957, Mario Salcedo was driving his Plymouth automobile south on San Vicente Boulevard in Beverly Hills. The posted speed for automobiles

traveling south on San Vicente at that point was 25 miles per hour. Salcedo stopped for a red light at the intersection of San Vicente and Wilshire Boulevard. While he was waiting for the signal to change, a Lincoln automobile, also going south on San Vicente, struck the rear end of the Plymouth, damaging both vehicles and causing severe injuries to Salcedo, who sustained a fractured skull. The Lincoln was registered to "Gordon T. or Elizabeth Campbell." Salcedo was taken to the hospital where he remained for 10 days. At the time of trial, he was still under a doctor's care.

One Porche, who was waiting for the signal in the lane to the right of Salcedo, testified that defendant got out of the Lincoln immediately after the collision, approaching to within a few feet of Salcedo, who was lying on the front seat of the Plymouth, and then started to walk west on Wilshire Boulevard without giving his name or exhibiting his driver's license. Porche's passenger, a Mrs. Le Sassier, testified that defendant asked her what had happened and that she replied: "Can't you see what happened? Didn't you just hit this man?"; without saying anything further, defendant walked away.

William Fairlee, a police officer, testified that he drove Porche up Wilshire Boulevard in a police car to look for defendant. They found Campbell standing on the northwest corner of Wilshire and La Cienega, which was three blocks away. Fairlee asked defendant for some identification and defendant replied that he did not have to give any identification since he had not done anything. Upon being asked by the officer why he had left the scene of the accident, Campbell answered that he didn't know anything about any accident. When asked to accompany the officer, defendant refused to go. Fairlee forcibly placed Campbell in the car and returned to the scene where they met another officer, Marvin Sullivan.

Upon being questioned further by the officers at the scene, Campbell admitted having had two drinks of scotch at the Red Snapper Restaurant. He told the officers that he was in the Lincoln when the collision occurred, but he was not driving. The driver was a man he had met at the Red Snapper; he did not know the man's name. When the officers asked him whether he had been injured, defendant replied that he had not been hurt; he had no visible injuries. Officer Fairlee stated that defendant's breath smelled of alcohol, his eyes were watery and his face had a bloated appearance. The officers

gave him a sobriety test. In their opinion, Campbell was under the influence of intoxicating liquor.

Sullivan testified that he observed 44 feet of skidmarks on the street; the marks terminated at the point of impact. In his opinion, the Lincoln had been traveling in excess of 40 miles per hour at the time of the collision; he based his opinion upon the skidmarks, the damage to both vehicles and the distance Salcedo's car had been pushed forward by the collision.

Defendant, testifying in his own behalf, denied having been intoxicated. He spent the earlier part of the evening of February 6 with a Miss McNally and a Mrs. Auchincloss. Around 8 p. m. he went to the Red Snapper Restaurant on La Cienega, where he had dinner with the proprietor, a Mr. Herd, who was a friend. He ordered one drink of scotch at the bar and took it to the dinner table. Defendant sat talking with Herd until 11 or 11:15 when Herd left. Campbell remained for another 45 minutes. He had nothing further to drink before leaving the restaurant. Mr. Herd and Daniel De Blasio, a bartender employed at the Red Snapper, testified that Campbell had only the one drink at the restaurant.

Defendant testified further that after leaving the Red Snapper he drove "very normally, down San Vicente towards Wilshire." Just north of the intersection, Salcedo's car veered suddenly into his lane of traffic from the parking lane to his right. Campbell applied his brakes but they did not hold; he applied the emergency brake, but was unable to stop. He swerved to the right but was unable to avoid striking Salcedo's car. Campbell stated that his chin hit the steering wheel and he could not recall any of the events that happened subsequently or any of the statements that were made by the other witnesses or that were attributed to him. His first recollection was of being in jail, feeling cold, and asking for some blankets. Two of his teeth were broken off and he received a bruise on the right side of his jaw that was visibly red for several days afterward.

On cross-examination, defendant admitted that he probably walked up Wilshire from "instinct" to get help at a service station located on the northwest corner of La Cienega and Wilshire where he often bought gasoline. He had not been aware that there was an all night restaurant located on the south side of Wilshire at its intersection with San Vicente and an all night service station on the northeast corner of Wilshire and La Cienega.

William Welsh, a private investigator called by the defense, testified that he examined the area nine days after the collision and did not see any skidmarks. Miss McNally and Mrs. Auchincloss appeared for the defense and corroborated Campbell's statement that he had not had any drinks while in their company.

Dr. R. W. Hayward, a dentist called by defendant, stated that he examined Campbell's teeth on March 26 and found that two teeth on the right side which held his denture had been broken off. In his opinion, it would have taken considerable force to break off the teeth.

Ernest Bence, a witness for defendant, testified that he operated a service station in Brentwood. Two days before the collision, defendant drove into the station in the Lincoln using the emergency brake. Bence testified that he put in some brake fluid and told Campbell to have the master cylinder fixed "as soon as possible." Some time after the accident, defendant took his car to a repair shop operated by one Safady. A week or 10 days after the car was brought in Safady tested it and found that the brakes did not hold. He took the car to a brake specialist, who opened the master cylinder and told him that the cylinder was leaking. In Safady's opinion, the leak was due to wear and tear; he had not examined the brakes and his opinion was based upon his previous experience in the repair business.

In urging a reversal of the judgment and order, defendant argues numerous assignments of error. It is not contended that the evidence was insufficient to support the verdicts.

■■■ With respect to Count I of the information which charged Campbell with felony drunk driving, defendant requested and the court refused to give an instruction on the doctrine of imminent peril and an instruction on misdemeanor drunk driving.

The first mentioned instruction was a proper statement of the rule that one who, *without negligence on his part,* is suddenly confronted with unexpected and imminent danger, is expected to exercise only the care that an ordinarily prudent person would exercise if confronted with the same unexpected danger under the same circumstances.

The evidence which defendant contends rendered the instruction applicable was the following: It appears that the southbound section of San Vicente at the location in question is a one-way street with four lanes. Campbell testified that

he was traveling in lane four, he saw a car in lane three and "Well, I thought the car veered slightly to the left. I thought he was in the third lane. He changed from the third—I say he— as we approached here, he seemed to go from Lane 3 to Lane 4," and he testified, as previously stated, that when his brakes failed he swerved to the right.

In order to establish a violation of Vehicle Code, section 501, it must be shown that the accused drove a vehicle on a public highway while under the influence of intoxicating liquor, that, in so driving, he committed an act forbidden by law or neglected a duty imposed by law, and that said act or neglect was a proximate cause of bodily injury to some person.

The possible violations of law that were to be considered were driving at a speed in excess of 25 miles per hour which, prima facie, would have been in violation of section 510 of the Vehicle Code, driving with defective brakes in violation of section 670 of the Vehicle Code, or driving without the use of ordinary care or skill, in violation of the duty imposed by section 1714 of the Civil Code.

Section 670 of the Vehicle Code requires that automobiles when driven upon a highway must be equipped with brakes "adequate to control the movements of and to stop and hold such vehicle, etc." Defendant knew his brakes were defective. Two days before the accident he was informed that the fluid had leaked out of the braking system and that he had no brakes except the emergency brake. He was told to have the condition repaired as soon as possible. He paid no attention to that admonition. He did not know, and he made no effort to find out, whether the brakes would continue to operate for hours or days or weeks. So far as he knew the leak might have been such as would have depleted a supply of brake fluid at any moment. He gave no thought to the danger that was involved and apparently intended to continue driving until his brakes failed again. This is precisely what happened.

The rule of sudden peril has application only to conduct which follows the unexpected appearance of danger. It was not applicable to the conduct of defendant prior to that time, namely, with respect to his speed or to his driving with his brakes in a defective condition.

Defendant had a right to have the jury instructed in accordance with his own theory of the case, which encompassed also instructions that were pertinent to an expression

of his contentions with respect to the legal theories of the prosecution. It is necessary to examine those theories in the light of the evidence.

With respect to a claimed violation of law the contention of the People was that defendant was driving at an excessive speed, and they relied upon evidence of skidmarks of 44 feet which ended at the point of the accident, and upon expert testimony, based upon the skidmarks and the force of the collision, that his car was traveling at 40 miles per hour when the brakes were applied. The People did not contend that defendant was guilty of negligence in failing to make every effort to stop, but, upon the contrary, their evidence tended to prove that he did make a real effort, and that his speed was such that he could not stop. There was nothing in the People's evidence or their theory of the case that would have rendered appropriate the instruction on imminent peril. Neither was the instruction applicable to the defendant's theory of the case, which was that he made every effort to stop and to turn aside, and that so far as his conduct was concerned, the failure of his brakes was the sole cause of his failure to stop. His evidence furnished no reason for application of the rule of imminent peril. We can conceive of no state of facts reasonably deducible from the evidence which would be inconsistent with the theory of the People and also the theory of the defendant. In other words, there was no evidence whatever that would have warranted the jury in finding that defendant did not use ordinary care to come to a stop after he observed the movement of the Salcedo car.

Furthermore, defendant would not have been entitled to the instruction unless the jury could with reason have found that at the time of the appearance of the imminent danger he was driving in the exercise of ordinary care. Where the evidence would have warranted either of two conclusions, namely, that defendant had good brakes and skidded his car 44 feet, or that he had no effective brakes and was unable to stop, the jury could not have reached the absurd conclusion that defendant had good brakes, was driving at a reasonable and prudent speed but did not use ordinary care to stop his car after he saw the movement of the Salcedo car.

If we assume, for the moment, that it was a question of fact whether defendant was guilty of negligence in driving with defective brakes, it is, in our opinion, utterly improbable that the jury would have reached the conclusion that his conduct was that of a reasonably prudent driver. Unless the

jury determined that his driving the car with his brakes in the defective condition that was known to him was the conduct of a reasonably prudent man, it would have been obliged to conclude that he was guilty of unexcused violation of Section 670. (*Alarid* v. *Vanier*, 50 Cal.2d 617, 624-625 [327 P.2d 897].) Whether he had good brakes and was driving so fast he could not stop, or was driving with defective brakes, the jury could not, in our opinion, have found that he was free from negligence at the time he observed the movement of the Salcedo car. Unless he was then free from negligence his negligence was one of the causes which created the peril and the instruction was inapplicable.

Finally, the claim of error in failing to give the instruction on imminent peril would be without validity unless, there is reason to believe that the jury found that defendant was negligent in his conduct after he discovered the movement of the Salcedo car and might reasonably have reached a different conclusion if the requested instruction had been given. Such a contention would be entirely untenable and for this reason, if for no other, we would have to hold that defendant suffered no harm in the refusal of the instruction.

 The next contention is that the court committed error in failing to give defendant's requested instruction which related to misdemeanor drunk driving, a lesser and necessarily included offense (Veh. Code, § 502). Under this instruction defendant would have been entitled to an acquittal of violation of section 501 if the jury determined that although he may have been under the influence of liquor he was not guilty of violation of law which was a proximate cause of the accident.

We do not doubt that despite the evidence respecting the skidmarks and the force of the collision the jury could have found that defendant was not driving at an unlawful rate of speed. In that view of the evidence, and absent evidence of any other violation of law, it would have been proper to give the instruction. But if the jury had believed that defendant's speed was not excessive there would have remained the question whether his conduct in driving with defective brakes was that of a reasonably prudent man. We have already expressed the opinion that the jury could not reasonably have reached that conclusion. Being convinced that the verdict of violation of section 501 would have been the same had the instruction been given, we hold that the failure to

give it furnishes no ground for reversal of the judgment as to Count I of the information.

█ With respect to Count II, which charged him with failing to stop, identify himself and render assistance to Salcedo, defendant requested the following instruction: "Before you can find the defendant guilty as charged, his failure to perform one or more of the duties imposed upon him must have been wilful; and if you believe that he himself was so injured by the collision as not to be in possession of his faculties and his failure was due to that condition, then he should not be convicted." The proposed instruction was refused. At the People's request, the court instructed the jury as follows: "A vehicle driver who is rendered unconscious by an accident may not be held criminally liable for a failure to perform any duty defined in the foregoing law [Veh. Code, § 480] while he is thus incapacitated." Defendant contends that the instruction given by the court was a misleading and inadequate statement of the law applicable to his defense that he was not guilty of a conscious failure to perform the duties imposed by the statute. He also contends that the court committed error in refusing to give the instruction proposed by him.

We cannot agree that the jury was misdirected to Campbell's prejudice by the instruction given at the People's request. That instruction, when considered in isolation, is properly to be criticized. If, defendant argues, the instruction means what it says, and no more, the jury might well have been led to believe that Campbell was to be excused only if he had been rendered completely unconscious by the collision, and oblivious to his surroundings and to what had occurred. But in the light of other instructions given on the issue of criminal intent, we do not think the jury could have been so misled. The jurors were told that the duties imposed by the code apply to persons "knowingly" involved in an accident and that the "wilful" failure of a driver to perform any of those duties is a criminal offense; that the statute is applicable to a driver who "knows" that he has been involved in an accident and that his failure to stop, identify himself and render assistance must be "wilful" and in another instruction, given at Campbell's request, that knowledge of the infliction of injury upon another person is an essential element of the offense. A fourth instruction stated that Campbell's conduct was not culpable unless it was knowing and wilful.

The instructions made it clear that inability to know what was going on or what had occurred would be a good defense, even though defendant's mental condition fell short of complete oblivion. In fact, the instructions that were given stated the law in much better form than it was stated in the refused instruction, which would have invited the jury to consider whether defendant was "in possession of his faculties." The instruction could well have been refused upon the ground of ambiguity. We do not doubt that the jurors understood they were to acquit Campbell on the second count if they believed his testimony respecting his mental incapacity.

■ Defendant's brief specifies many instances of alleged misconduct on the part of the court. With minor exceptions they relate to interruption of the proceedings by the trial judge by propounding questions to witnesses for the People during the course of their examination by the deputy district attorney. It would unduly prolong this opinion to give the full text of the questioning. A brief summary will suffice. In 15 or more instances, the court interrupted the examination of the People's witnesses by the deputy district attorney by questions which were calculated to and did elicit testimony seriously adverse to the defendant. The court asked a witness whether defendant said anything to any one immediately after the accident, whether he gave his name and address or showed his operator's license to any one, whether the officers' car was painted black and white, whether a witness who was testifying to a conversation with the defendant had made any observation with respect to defendant's sobriety, whether he smelled defendant's breath and what he observed, whether he had questioned the defendant respecting his drinking. When another witness was testifying to the condition of the surface of the highway, the court interrupted to ask whether the witness had an opinion as to defendant's sobriety. In other instances, the court cross-examined witnesses for the defendant in a manner that was abrupt and critical.

The interrogation of the witnesses by the deputy district attorney on direct and cross-examination was orderly and efficient. The questions propounded by the court were only those which would naturally have been asked by the prosecutor. Nothing had been overlooked or was likely to be overlooked by the prosecutor in the elicitation of all relevant testimony. There was no hesitation upon the part of any of the witnesses to testify freely and no uncertainty whatever in their testimony. There was no occasion whatever for the

court to take over the duties of the deputy district attorney in the questioning of the witnesses, and yet this is what the court did persistently.

There can be no doubt as to the duty of a judge to render assistance during the course of production of evidence in a jury trial, where assistance is needed. A witness may be evasive and his answers incomplete or uncertain, important matters may be overlooked by counsel, and in these and similar instances, it is entirely proper for the court to intervene in order to aid in the elicitation of clear and comprehensive testimony. This, of course, must be done in a manner that gives no indication of the court's inclination for or against either party. But for the court in a criminal case to interrupt the orderly and efficient interrogation of the People's witnesses by the prosecutor and to take over the latter's duties repeatedly, as was done in the present case, can scarcely fail to have some influence upon the minds of the jurors adverse to the defendant.

Judges have been admonished time and time again of their duty to maintain a strictly judicial attitude and to refrain from comment or other conduct which borders upon advocacy. We deem it appropriate to quote in part the remarks of the Supreme Court in *People* v. *Mahoney*, 201 Cal. 618, 626-627 [258 P. 607] : "Jurors rely with great confidence on the fairness of judges, and upon the correctness of their views expressed during trials. For this reason, and too strong emphasis cannot be laid on the admonition, a judge should be careful not to throw the weight of his judicial position into a case, either for or against the defendant. It is unnecessary to cite the cases bearing on this subject. It is a fundamental principle underlying our jurisprudence.'' When the trial judge officiously and unnecessarily usurps the duties of the prosecutor by taking over the questioning of witnesses and in so doing creates the impression that he is allying himself with the prosecution, harm to the defendant is inevitable. We do not see how any judge could fail to recognize that fact. (*People* v. *Long*, 63 Cal.App.2d 679, 685 [147 P.2d 659].)

Our question is not whether the court's conduct was harmful to the defense; we are certain that it was. The difficult question in such situations is whether the invasion of the defendant's rights was of so serious a nature as to have resulted in a conviction which otherwise, in all probability, would not have occurred. If we were in doubt here as to the

correct answer we would resolve the doubt in favor of the accused.

Our conclusion is that the conduct of the court did not result in a miscarriage of justice. With respect to an alleged violation of section 501 of the Vehicle Code, the evidence, both direct and circumstantial, firmly established the fact that defendant was intoxicated, if the witnesses for the People were to be believed. With respect to his having been operating his car in violation of law, we have already expressed the view that the jury could not reasonably have failed to find that in driving it with brakes which he knew to be defective defendant was not acting with reasonable prudence and care. There was also persuasive evidence that he was driving at a speed which endangered the safety of persons and property in violation of section 510 of the Vehicle Code. There was, of course, no doubt that Mr. Salcedo was seriously injured as a proximate result of defendant's conduct. There was also convincing evidence of a violation of section 482, subdivision (a) of the Vehicle Code consisting of the failure of defendant to give his name, address, registration number of his vehicle and name of the owner to Mr. Salcedo, and the failure to render assistance to him. The only excuse offered by defendant for failure to identify himself and for leaving his car in the street while he departed the scene was that he was rendered unconscious in the sense that he did not know what had happened or understand what he was doing following the accident. His testimony to that effect had but slight, if any support in the nature of his injuries or in his conduct. There was no convincing evidence that he received a concussion or a blow which was severe enough to seriously impair his mental faculties or which required medical care. He testified that he probably left the scene of the accident to find a telephone for the purpose of making a report of it. There was uncontradicted evidence that his conversation following the accident was lucid and his physical actions normal except for the symptoms of intoxication. There was ample evidence that the injuries he received did not render him unable to understand what had happened and what he was doing thereafter. We are of the opinion that under the evidence and the proper inferences the question of defendant's guilt under either count was not a close one, and we are not convinced that if the interruptions and interrogation of witnesses by the court had not occurred, the verdict would have been different as to either count.

█ Defendant also contends that the court erred in failing to instruct the jury that he need only raise a reasonable doubt that he was unconscious in order to be entitled to an acquittal. A sufficient answer to this contention is that defendant did not request such an instruction. In the absence of such a request the general instructions on reasonable doubt were sufficient.

█ The court did not commit error in excluding testimony which defendant proposed to give respecting a conversation he had with Salcedo and Salcedo's physician at the hospital about a week after the accident. Counsel offered to prove that Dr. Laurion told defendant that his patient had suffered a slight concussion, but was about cured, and that Salcedo said he was feeling "wonderful." Defendant's argument is that evidence of the conversation was admissible to impeach the testimony of Salcedo and Dr. Laurion that the former had been seriously hurt and also to prove that Salcedo had suffered no apparent injuries, hence Campbell was not under a duty to assist him. The argument is without merit. Salcedo's condition following the collision was described by Porche and the two police officers and it cannot be doubted that he was injured and in considerable pain. The fact, if it be a fact, that Salcedo was feeling better a week after the accident would not lead to an inference that he had suffered no injury or that he had not appeared to be hurt.

█ The court likewise did not commit error in refusing defendant a continuance in order to produce an absent witness who was not under subpoena. Counsel informed the court that he had miscalculated the time necessary to present his case, that he wished to call a certain doctor to the stand, but that he had told the doctor to be in court at 2 p.m. It was then late morning. The court refused a continuance and the defense rested.

█ If a witness is directed that he need not appear until a certain time and the court is ready to receive his testimony before that time, it is within the court's discretion to deny a continuance requested for the purpose of producing the witness. (*People* v. *Morhar*, 78 Cal.App. 380, 386 [248 P. 975].)

█ Counsel did not disclose the name of the witness and made no showing that the doctor's testimony would be material. Had counsel deemed the testimony of the witness to be vital to the defense, he could have made a motion to reopen his case at 2 p. m., even though the cause was then being argued to the jury. (*People* v. *Morgan*, 140 Cal.App.2d 796, 804 [296

P.2d 75].) The court did not abuse its discretion in denying a postponement of the trial. (*People* v. *Franklin*, 41 Cal.App. 2d 669, 670 [107 P.2d 500] ; *People* v. *Sherman*, 139 Cal.App. 2d 429, 431-432 [293 P.2d 809].)

From a consideration of the entire evidence, we are convinced that the judgment and order should be affirmed.

The judgment and order are affirmed.

Wood (Parker), J., and Nourse, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 10, 1958. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.