[Crim. No. 347.   Third Appellate District.—September 19, 1916.]

## THE PEOPLE, Respondent, v. AMEDIO FINALI, Appellant.

CRIMINAL LAW—MURDER—SELF-DEFENSE—DOCTRINE OF APPARENT DANGER—INCONSISTENT INSTRUCTION.—In a prosecution for the crime of murder, where the plea made by the defendant is that of self-defense, an instruction that there must have been a present ability on the part of the assailant to accomplish his criminal design in order to justify the person assailed in taking his life is inconsistent with the doctrine of apparent danger to one who is assailed, but is not so misleading as to have caused a miscarriage of justice, where the evidence shows whatever real or apparent necessity defendant believed to exist for the killing was created by his own fault.

ID.—PLEA OF SELF-DEFENSE—WHEN NOT AVAILABLE—SEEKING OF QUARREL.—An instruction that self-defense is not available as a plea to a defendant who has sought a quarrel with a design to force a deadly issue and thus, through his fraud, connivance, or fault, create a real or apparent necessity for the killing, is proper, where the evidence shows that whatever real or apparent necessity the defendant believed to exist for the killing was created by his own fault.

ID.—DOCTRINE OF SELF-DEFENSE.—The doctrine of self-defense presupposes that one who would avail himself of it has, without his fault, found himself in threatened danger of serious bodily injury, to avert which the law gives him the right to resort to extreme measures. But the plea is not available to him where he willfully and without any necessity for his own protection creates the danger with which he is threatened.

ID.—RETURN OF JURY FOR FURTHER INSTRUCTIONS—RIGHT OF DEFENDANT.—Upon the return of the jury for further instructions while deliberating on the verdict, the defendant is not entitled as a matter of right to have read to them instructions not called for, or to have all of the instructions upon a given subject read, when such as are read are stated to be satisfactory to them.

ID.—ARGUMENT OF DISTRICT ATTORNEY—COMMENT UPON FAILURE OF DE-
FENDANT TO DENY SELF-INCRIMINATORY STATEMENT—LACK OF PREJU-
DICE.—In such a prosecution, while it is wrong for the district
attorney in his argument to the jury to make reference to the fact
that the defendant, while on the witness-stand, had failed to make
denial of a somewhat self-incriminatory statement which he made at
the time of his arrest and which was introduced in evidence, such
misconduct is not prejudicially erroneous, under section 4½ of article
VI of the constitution, where the jury was fully advised as to the
subject matter of such statement through other testimony.

ID.—MISCONDUCT OF DISTRICT ATTORNEY—WHEN GROUND FOR REVERSAL.
Where misconduct of the district attorney is claimed as prejudicial,
if attention is called to it and the court instructs the jury to dis-
regard it and not allow themselves to be influenced by it, the mis-
conduct must be flagrant and obviously prejudicial to justify a
reversal.

APPEAL from a judgment of the Superior Court of
Shasta County, and from an order denying a new trial.   J. E.
Barber, Judge.

The facts are stated in the opinion of the court.

Braynard & Kimball, for Appellant.

U. S. Webb, Attorney-General, and J. Chas. Jones, Dep-
uty Attorney-General, for Respondent.

CHIPMAN, P. J.—Defendant was informed against by the
district attorney of Shasta County for the crime of murder,
and at his trial was convicted of manslaughter and sentenced
to imprisonment for the term of seven years in the state
prison.   He appeals from the judgment of conviction and
from the order denying his motion for a new trial.

Defendant shot and killed Vincenzo Coudera on Sunday at
about half-past 4 o'clock in the afternoon of November 28,
1915, at the warehouse (sometimes called stable by witnesses)
of Giacossa & Bellone, near the Mammoth mine, in Shasta
County.   Defendant justifies the killing on the plea of self-
defense.   Defendant and deceased met near this warehouse
shortly before the homicide; they were but casually ac-
quainted with each other; defendant had been told that de-
ceased had said that defendant was watching for one Tony
Claro every evening with intent to assault him; at the meet-

ing of defendant and deceased above referred to, deceased
was pointed out by one Peselli as the person who had made
the statement, whereupon defendant asked deceased why he
had made such statement to Claro; deceased denied that he
had made it and defendant replied that he, deceased, did
make the statement because Tony so told defendant. There-
upon defendant extended his hand toward deceased, whether
in a threatening manner or by way of assault or as an invi-
tation for an encounter, does not clearly appear. However,
the two men grappled and a scuffle ensued, in the course of
which they fell to the ground, defendant on top of deceased.
Bystanders interfered and the two separated, defendant walk-
ing away a few steps. When deceased arose he picked up a
stone and threw it at defendant, hitting him on the left
shoulder, and immediately ran into the warehouse and closed
the door.

The eye-witnesses were Italians, whose testimony was taken
through interpreters. Several exhibits were introduced to
assist the jury in understanding the facts and circumstances
surrounding the homicide, among which was the bullet caus-
ing the death of deceased, taken from the body of the de-
ceased, the latter's clothing worn at the time, defendant's
revolver, the door through which, as was claimed by the
prosecution, the fatal shot was fired and in which two bullet
holes appeared, the door casing or four by four scantling to
which the door was latched when closed, and which showed
an indentation claimed by the prosecution to have been made
by one of the bullets when the first shot was fired, sundry
photographs, diagram of the warehouse premises, and two
or three other exhibits, none of which was sent up with the
record. Obviously, we are deprived to some extent of the aid
which these exhibits afforded the jury. For example, de-
fendant claims that the bullet found in the body of deceased
was a fragment only, and that the first shot fired by defend-
ant struck a beer bottle which the deceased threw at defend-
ant, and that the bullet was split and a fragment of it caused
the death of deceased, and not one of the bullets that went
through the door of the warehouse. The scantling or door
case was introduced and the indentation found on it was
shown to the jury in support of the theory of the prosecu-
tion that the bullet from the first shot struck the edge of this
door casing and passed on into the building. The second

31 Cal. App.—31

shot was shown to have gone through the door and the bullet hole was in line with a bullet hole through the opposite side of the building. The third shot concededly went through the door, and the position of the hole tended to show that it was where deceased was pushing at the door.

We think, however, that the evidence found in the record is quite sufficient to justify the verdict without having these exhibits before us to explain the testimony.

It appeared that when the first altercation occurred the parties were within two or three feet of the warehouse door; when defendant released the deceased and the latter got up, defendant moved away two or three steps and was standing sidewise to deceased when the latter threw the rock, hitting defendant on the left shoulder as above mentioned. Deceased immediately ran into the warehouse, the keeper, Fracchia, with him, and closed the door and both braced themselves against it on the inside, deceased next to the latch and Fracchia next to the hinges. When defendant was hit with the stone he ran after deceased and reached the door about the same time the two other men had closed it. He immediately endeavored to force it open, kicking and pushing it and calling to deceased to "come out." It was testified by witnesses who were outside of the warehouse that defendant had his revolver in one hand while he was trying to force the door open. It was in evidence that during this struggle on the part of defendant to open the door and deceased and Fracchia to hold it fast, it was opened and closed a few inches at intervals, during one of which deceased threw or struck with a quart beer bottle which he had picked up with one hand while pushing with the other and at about the same instant defendant fired the first shot. The bottle was broken into pieces, some of them falling within and some without the door. The evidence does not show how the bottle was broken. Defendant was not hit with it. He testified that he shot Coudera because he thought he was about to hit him with the bottle. Fracchia testified that he heard the bottle strike and break against the door casing just before the shot was fired. After the first shot the door was shut and Fracchia and deceased remained pushing against it. The second and third shots followed in quick succession, the last one, it is claimed by the prosecution, being the one that hit and killed the deceased. When deceased was hit he exclaimed, "I am shot

in the stomach," and Fracchia cried out to stop shooting, that one of them was wounded. Deceased staggered back from the door to another part of the warehouse and shortly afterward expired. The door was opened and among others defendant went in, looked at deceased, and immediately left, and was the next day arrested at the town of Tehama.

Fracchia testified: "Q. Now, when Coudera came inside the warehouse, what did he do? A. He shut the door right away. Q. Was the door open or closed when Coudera came inside? A. Open. Q. When Coudera closed the door what did he do? A. He put himself right away against the door. Q. And how did he hold the door? A. With both hands. (Witness illustrates.) Q. What did you do? A. I put myself also against the door. (He explained the relative position of the two men, deceased on his right, next to the door latch.) Q. When you and Coudera placed yourselves against the door as you have illustrated, what next occurred? A. Finali was pushing at the door and we was pushing back. Q. Did Finali say anything as he was against the door on the outside? A. He was saying to open the door—'Open, open.' Q. While Finali was pushing against the door from the outside and you and Coudera were against the door on the inside, what happened to the door, if anything? A. It happened that after he pushed the door several times, Coudera got ahold of a bottle. Q. When you say, 'He pushed the door several times,' whom do you refer to? A. I think it was Finali; I couldn't see outside. (It elsewhere appeared that defendant was the only person pushing the door from the outside.) Q. Where did Coudera get the bottle? A. From the floor. Q. And what part of the floor? A. To the right side—north side. Q. And how far was the bottle from the door on the north? A. More or less, a foot and a half. (A photograph was shown witness on which he located the place where the bottle was. He also illustrated how Coudera reached out and got the bottle with his right hand while pushing against the door with his left hand.) And when Finali pushed the door he (Coudera) done like that (illustrating as if throwing an object with the right hand). Q. Which hand, right or left, did Coudera reach for the bottle? A. With the right one. Q. At the time that Coudera reached with his right hand for the bottle, where was his left hand? A. At the door. Q. What did Coudera do with the bottle

after he got it in his right hand? A. He held it there for a little while and while the other was pushing at the door, he threw it at him—he threw it. He threw it. Q. And was the door open or closed at that time? A. When he threw the bottle, the door was open a little bit. Q. What happened when Coudera threw the bottle? A. When Coudera threw the bottle, I heard the report of the bottle, and the shot, 'Pom! Pom!' Q. What happened to the bottle? A. The bottle broke. Q. When did the bottle break with reference to the time that you heard the shot? A. First I heard the sound of the bottle and then the shot of the pistol. Q. What do you mean by the sound of the bottle? A. The sound of the explosion of the bottle. Q. How did the bottle break, if you know? A. That I don't know. Q. Did the bottle break inside the door or outside the door? A. Inside the stable. Q. When the bottle broke what did Coudera do? A. He put himself against the door." He was asked to illustrate: "A. Like that. (Witness illustrates by arising and facing the wall, bending forward slightly and placing both hands flat against the wall.) Q. What occurred after Coudera placed himself in a leaning position with both hands against the door as you have illustrated? A. It occurred that the shots were fired. Q. How many shots were fired? A. Three shots. Q. How many shots were fired after Coudera placed both hands against the door in a leaning position immediately after the bottle was broken? A. Two shots. Q. After the two shots were fired, what happened? A. I heard Coudera say, 'Oh, I am wounded in the stomach.' Q. And what did Coudera do after he said that? A. He turned around and walked to the little room. Q. When you heard the bottle break did you hear another noise? A. When the bottle broke I heard the fire of the pistol—the shot of the pistol. Q. When Coudera said: 'I am wounded,' what did you do? A. Then I began to holler, 'Stop! Stop! He is wounded.' . . . Q. From the time that Coudera came inside the warehouse, closed the door and leaned against the door, did he at any time let go of the door with both his hands? A. I never saw him move from the door." He testified that the door opened two or three times, as he estimated it, before the first shot was fired, once he thought eight or ten inches.

Witness Benedetti went into the warehouse about the same time deceased entered it and from a point fifteen or twenty

feet from the door saw and heard what took place in there. He testified: "Q. At the time the bottle broke, was the door open or closed? A. There was about that much open (showing). Q. State how many inches? A. About a foot or foot and a half. Q. Was Fracchia against the door or leaning against the door when the last two shots were fired? A. He was at the door pushing. Q. What happened after the last shot was fired? A. Mr. Coudera went backward and he was wounded here (indicating in the breast). . . . Q. Did anyone say anything after the last shot was fired? A. Mr. Fracchia told him not to fire any more—told Mr. Finali not to fire any more." He testified that Coudera had the bottle in his right hand and was "pushing against the door this way (showing)."

The autopsy showed that the bullet entered the body of deceased "between the first and second cartilages on the right side—in front, . . . the bullet entered near the apex of the lungs, passed down through the base, through the diaphragm, through the liver, and passed out between the eleventh and twelfth ribs and entered and lodged in the back about three inches from the spine on the right side of the body, about one inch from the skin—general course was down and back." Dr. Sanholdt, who made the autopsy, testified that the cause of death was "bleeding from the vena cava, which was torn by the bullet"; that a man with such a wound would live but a short time—"it is only the matter of a moment. Q. As much as a minute? A. I don't think so. . . . He might utter a few words but I doubt if he could make any coherent sentences." He testified that the point where the bullet lodged was about twelve inches lower than the point of entrance, and that the bullet encountered no bone in its passage.

We think the jury were warranted in finding that the fatal shot was fired through the door while deceased and Fracchia were holding it shut and endeavoring to keep defendant from entering. The position of deceased at the door—a position one would naturally assume in pushing with his hands against a door to hold it fast—would account for the entrance of the bullet as described and its course backward and downward. It is true this might possibly have happened had the bullet struck the bottle and had a fragment of it been deflected toward deceased. Bullets take eccentric courses some-

times after entering the body. But the evidence was that deceased did not exclaim that he was shot until the third shot was fired and while he and Fracchia were pushing at the door, and the evidence was also that had he received this wound from the first shot, it would have immediately disabled him from making any further physical effort toward keeping defendant out of the building. But if it be conceded that the first shot was the fatal one, we cannot see that it was justified upon any view of the doctrine of self-defense. Defendant was clearly the aggressor. With revolver in hand he was trying to force his way through the door, which was being held to prevent his entrance. Having succeeded in pressing it partially open, the deceased was the one then in danger, and had he given defendant a fatal blow with the bottle, the doctrine of self-defense and the right to act upon appearances might have been available to deceased.

Defendant could not by his own willful act create a situation giving rise to appearances which he could interpret as endangering his life and thereupon kill the person he was assailing. As was said in *People* v. *Hecker,* 109 Cal. 451, 462, [30 L. R. A. 403, 42 Pac. 307, 311] : "A man may not wickedly or willfully invite or create the appearances of necessity, or the actual necessity which, if present to one without blame, would justify the homicide."

Defendant lays much stress upon the fact that deceased hit him with a rock after they had separated from the first encounter. Had defendant overtaken deceased in the heat of the moment and suitably punished him for this assault, he might not have been blameworthy. But he lost this opportunity by deceased having reached a harbor of safety where he was in no position to do defendant further harm. Thenceforth defendant was clearly the aggressor. Under the circumstances disclosed, the plea of self-defense in killing deceased was not open to him. It seems to us that the jury exercised much charity in finding that the homicide was "upon a sudden quarrel or heat of passion," and but manslaughter.

2. The court instructed the jury quite fully on the law of self-defense and the right of one being assailed to act upon appearances. It is not objected that these instructions were incorrect, but it is objected that the court in the same connection instructed the jury as follows: "There must have

been a present ability on the part of the assailant to accomplish his criminal design in order to justify the person assailed in taking his life.'' It is contended that there was conflict in the evidence as to whether deceased struck at defendant through the open space when the door was open, or whether deceased threw the bottle at defendant through the opening and whether the bottle was broken by the bullet at the first shot or struck the door casing and was broken, and that there was a conflict in the evidence as to whether the shot was fired before, at the time, or after the bottle was thrown. In this state of the evidence it is claimed ''that the jury may have believed, under this instruction of the court, that the bottle was broken before the first shot was fired, and that the door was closed when the last two shots were fired, and that therefore, as a matter of law, deceased at neither time had the present ability to inflict injury upon defendant and defendant was in no real danger.''

We think the instruction was inconsistent with the doctrine of apparent danger to one who is assailed and was out of harmony with other instructions given upon the subject, and, taken alone, was an incorrect statement of the law. It must not be forgotten, however, that in no view of the evidence could it be reasonably said that deceased was the assailant. And when the door was pushed open by defendant, who was at that moment the real assailant, armed with a deadly weapon, which the sequel showed he intended to use, deceased had a right to defend himself against the threatened danger. By doing so, his relation toward defendant was not changed. Throughout their argument the learned counsel of defendant seem to hold that deceased became the assailant in having struck defendant with a rock after the latter had withdrawn from the first encounter, and that notwithstanding deceased had taken refuge in the warehouse, defendant had a right to pursue and punish him and still be within the protecting aegis of the doctrine of self-defense should deceased resist. This doctrine must not be confused with the *lex talionis*. The doctrine of self-defense presupposes that one who would avail himself of it has, without his fault, found himself in threatened danger of serious bodily injury to avert which the law gives him the right to resort to extreme measures. But, as we have already pointed out, the plea of self-defense is not available to him where he willfully and with-

out any necessity for his own protection creates the danger with which he is threatened. The law of self-defense is a law of necessity, and ceases with the disappearance of the necessity. Whatever may be said of the instruction, however, we are quite convinced that, error though it be, we cannot for a moment believe that the jury were so far misled by it as to have caused a miscarriage of justice, and unless we can so say we are forbidden to reverse the judgment. (Sec. 4½, art. VI, Const.; *People* v. *O'Bryan,* 165 Cal. 55, [130 Pac. 1042]; *People* v. *Bartol,* 24 Cal. App. 659, [142 Pac. 510]; *Vallejo & N. R. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545, [147 Pac. 238].)

3. The court instructed the jury as follows: "Self-defense is not available as a plea to a defendant who has sought a quarrel with a design to force a deadly issue and thus, through his fraud, connivance, or fault, create a real or apparent necessity for the killing." It is claimed that the instruction was not applicable to the facts because there was no evidence that either a real or apparent necessity for the killing was created by the fraud, connivance, or fault of defendant. The instruction was based upon the principle announced in *People* v. *Hecker,* 109 Cal. 451, [30 L. R. A. 403, 42 Pac. 307]. We think the evidence showed that whatever of real or apparent necessity defendant believed to exist for the killing was created by his fault. He had no right to break into the warehouse by force to assault deceased or to punish him for an assault previously made on defendant by deceased, and if, in doing so, danger to defendant appeared, it was of his own creation.

4. After the jury had been considering the case some time, they came into court and asked for the instructions on justifiable homicide to be again read to them. The court read its instructions on the subject, including the reading of section 195 of the Penal Code. On the suggestion of defendant's attorney, the court read still other instructions on the subject given at defendant's request. Defendant then asked to have a particular instruction read—"that the defendant need not wait until the blow is struck before acting in his own protection." "The Court: No, I will only act on the request of the jury. The Court: Is that all you wish, gentlemen? A Juror: Are we entitled to know what the penalties are in each degree? The Court: No, that is entirely in the discretion of

the court. The Juror: That is what I thought. The Court:
The court has told you about that heretofore. I will read
you this, gentlemen.'' The court then read one of its in-
structions in connection with the rule of reasonable doubt and
stating the law as to the right of the jury to fix the punish-
ment should the defendant be found guilty of murder in the
first degree. The jury were then asked if they desired any
further instructions and all answered satisfied.

The jury being still unable to agree came into court again
and requested ''a little information on one little point, and
that is, what creates a reasonable doubt.'' The court read its
instructions on that subject and asked the jury if they de-
sired anything further. ''The Foreman: That seems to be
the only thing, your Honor. The Court: Is that plain enough
to you, gentlemen? (An affirmation is given to the court.)''
The jury retired and later brought in their verdict. De-
fendant was not entitled as matter of right to have instruc-
tions read which the jury had not called for or to have all
the instructions on a given subject read when such as were
read were satisfactory to the jury.

5. The court refused certain instructions requested by de-
fendant on the ground that they were presented too late for
consideration by the court: (a) As to the right of self-defense
having been revived, after defendant withdrew from the first
conflict, by deceased having hit him with a rock; (b) defend-
ant not bound to retreat in the face of danger; (c) reasonable
doubt as to who opened the door and for what purpose it was
opened, and that such doubt should have been resolved in
favor of defendant. Whether or not the reason given by the
court was sufficient need not be considered, for we do not
think the defendant was prejudiced by the court's ruling.
The hitting of defendant with a stone by deceased after de-
fendant had withdrawn from the first conflict did not so far
revive defendant's right to self-defense as to justify him in
forcing a second conflict, as appeared by the evidence, and
killing deceased because in doing so he believed himself to
be in danger of great bodily injury. The doctrine of retreat
in the face of apparent danger had no application, since de-
fendant was the assailant. There was no evidence warrant-
ing the assumption that deceased opened the door for any
purpose or raising any doubt on that question.

6. Two instructions were refused, for one of which rulings the court assigned no reason and as to the other that it was covered elsewhere. The latter related to the doctrine of defendant's right to act upon appearances which was, as the court said, fully covered elsewhere in the instructions.

The other instruction proceeded on the assumption that deceased was the assailant at the time he was killed, and that defendant acted upon the reasonable belief that he was in danger of receiving great bodily harm from deceased at that moment.

7. In the course of his argument to the jury, the district attorney referred to an instance within his knowledge, of a bullet in passing through the front end of a wagon split in its course into two parts, hitting each horse and another part performing ,an equally freakish thing. Defendant objected and the district attorney asked the court to instruct the jury to disregard the illustration and confine themselves to the evidence, which the court did.

The defendant at the time of his arrest made a somewhat self-incriminatory statement which was introduced in evidence. The district attorney referred to the fact that defendant, when on the witness-stand, did not deny the truth of the statement. Upon defendant's objection as misconduct prejudicial to defendant's rights and motion that the court instruct the jury to disregard the same, the district attorney said: ''While we do not feel that there is anything prejudicial, at the same time we have no objection to the court's giving the instruction,'' and the court thereupon gave the requested instruction.

In his closing argument to the jury the district attorney stated that he did not believe Coudera (deceased) had ever made the statement to Tony Claro attributed to Coudera, for the reason that defendant did not call Claro as a witness to prove it, though subpoenaed by defendant and excused.

Where misconduct of the district attorney is claimed as prejudicial, the more recent decisions of the supreme court hold that, if attention is called to it and the court instructs the jury to disregard it and not allow themselves to be influenced by it, the misconduct must be flagrant and obviously prejudicial to justify a reversal. Such was the misconduct of the district attorney in *People* v. *Tufts,* 167 Cal. 266, [139

Pac. 78] , *People* v. *Derwae,* 155 Cal. 593, [102 Pac. 266] , and other cases cited by defendant.

In the present case the record shows that the district attorney exhibited commendable carefulness in the conduct of the trial, not to trench upon the rights of the defendant. No evidence was offered or admitted as to which defendant has assigned error. There was no attempt by the district attorney to repeat the objectionable statements. The reference to the eccentricities of a bullet was of no particular significance and, in fact, had as much application to defendant's theory as to the people's.

As to the nonappearance of Claro as a witness, the reference could not have injured defendant, for whether it was true or not that he told defendant what deceased said had very little if any significance. Reference by the district attorney to defendant's failure to deny his extrajudicial statement, while violative of the defendant's right to remain silent without prejudice for so doing, the statements of defendant were as to circumstances connected with the homicide about which the jury had full knowledge through testimony of witnesses. We may safely adopt what was said in *People* v. *Kromphold,* 172 Cal. 512, [157 Pac. 599] : ''While it was wrong for the district attorney to comment at all on the failure of defendant to testify upon this subject, it would be most unreasonable to assume, in the light of the attitude of the trial judge in the matter and the nature of the remarks, that the jury could have been influenced to the prejudice of the defendant by the statement complained of. (See *People* v. *Sansome,* 98 Cal. 235, [33 Pac. 202].) Certainly one cannot hold that this statement 'has resulted in a miscarriage of justice.' (Sec. 4½, art. VI, Const.) ''

The defendant was ably defended, and every opportunity given him to meet the evidence in support of the charge. We think the verdict was justified by the evidence and that no prejudicial error occurred at the trial which would warrant a reversal.

The judgment and order are affirmed.

Burnett, J., and Hart, J., concurred.