[Crim. No. 6673. In Bank. Jan. 27, 1961.]

THE PEOPLE, Respondent, v. LOUIS FREDRICK
RIGNEY, Appellant.

Newberry & Prante and Stafford W. Prante for Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant appeals from a judgment entered on a jury verdict convicting him of two counts of assault with a deadly weapon and one count of assault with a deadly weapon with intent to commit murder.

Defendant, a hospital corpsman in the United States Navy, was married to Janet Rigney, one of the prosecuting witnesses. Janet secured an interlocutory decree of divorce in July 1958. The decree awarded her custody of their infant daughter and gave defendant the right of reasonable visitation. He customarily visited the child one afternoon each weekend at a San Diego hotel where Janet's father resided. On the afternoon of Saturday, October 11, 1958, defendant arrived at the hotel to visit the child, but Janet had failed to bring her. After the time for the visit had elapsed, defendant drove to Janet's apartment in La Mesa, arriving there between 4:30 and 5. He found the front screen door locked and remained outside. Janet and Gaither Charles Brown met him at the door. Brown said that he had heard that defendant had been looking for him and asked if defendant wanted to see him. Defendant replied, "No, I don't care what you do; I came over to see the baby." He then asked Janet why she had not brought their daughter to the hotel. Janet replied that defendant had told her the previous week that he was not going to be in San Diego Saturday and defendant said she knew that was not true. He then asked if he could come

the following day. Janet said that she and Brown had other plans. Defendant turned to leave, and Brown followed him out to the gate. Defendant testified that Brown told him to "[s]tay away from Jan and Lynn [the baby]. If you want to see anyone, come and see me." Brown denied saying anything.

Defendant returned to San Diego. There is evidence that he had two or three martinis, went to his hotel room and got his pistol, and drove back to his wife's apartment, arriving there about 6 p.m. He walked to the locked screen door and said: "Tell Chuck [Brown] I changed my mind. I'd like to see him outside." The prosecution's witness testified that Janet called out "Rigs is back." Brown came from the bathroom, holding a glass and carrying his coat. He tossed the coat to his daughter Sharon and her friend Lynette, who dropped it, and handed the glass to Sharon, who dropped it, and it broke. As Brown approached the door, defendant drew his pistol and fired two shots. Brown flattened himself against the wall to the left of the door. Defendant fired two more shots, wounding Janet and Sharon. Brown looked out the door and saw defendant fumbling with the pistol. Brown jumped out, grabbed the pistol, and the two men scuffled. They entered the apartment where the pistol again discharged, wounding defendant in the left arm and shoulder. Brown and defendant continued the struggle and rolled outside. Brown seized the pistol and threw it into the nearby swimming pool. The police arrived shortly thereafter.

Defendant testified that his memory was impaired as to all events after his return to San Diego. He remembered drinking one single and one double martini and upon reaching his wife's apartment the second time seeing Brown suddenly appear at the screen door, jump to the side of the door and reach for his hip pocket. He did not remember going to his room and getting his gun. He did remember, however, that he had no intent to kill anyone and that he armed himself to prevent a fight with Brown. He testified that he remembered only isolated events after seeing Brown reach for his hip pocket and that he did not remember firing the gun.

Defendant contended throughout the trial that he did not form the specific intent to commit murder. His description of his state of mind during the period between his first departure from his wife's apartment and the moment he ceased firing as well as the conclusions of his medical expert, Doctor Robert F. Brandmeyer, a member of the psychiatric staff of the

United States Naval Hospital in San Diego, as to his state of mind during those critical moments were therefore vital to his defense. He contends that the trial judge erroneously questioned him and his medical expert in such an extensive, repetitious, and argumentative manner as to indicate to the jury the judge's disbelief that defendant could not remember what had happened and that the judge compounded his error by failing adequately to charge the jury that they were the sole judges of the facts.

A trial judge may examine witnesses to elicit or clarify testimony (*People* v. *Corrigan,* 48 Cal.2d 551, 555 [310 P.2d 953]; *People* v. *Ottey,* 5 Cal.2d 714, 721 [56 P.2d 193]; *People* v. *Carlin,* 178 Cal.App.2d 705, 714-715 [3 Cal.Rptr. 301]; *People* v. *Montgomery,* 47 Cal.App.2d 1, 18 [117 P.2d 437]). Indeed, "it is the right and duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence." (*People* v. *Corrigan, supra,* at p. 559.) The trial judge, however, must not become an advocate for either party or under the guide of examining witnesses comment on the evidence or cast aspersions or ridicule on a witness. (*People* v. *Campbell,* 162 Cal.App.2d 776, 787 [329 P.2d 82]; *People* v. *Lancellotti,* 147 Cal.App.2d 723, 731 [305 P.2d 926]; *People* v. *Huff,* 134 Cal.App.2d 182, 187-188 [285 P.2d 17]; *People* v. *Deacon,* 117 Cal.App.2d 206, 209 [255 P.2d 98].)

Both Penal Code, section 1122, and Code of Civil Procedure, section 611, provide that the judge must admonish the jury not to form or express any opinions on any subject connected with the trial until the case is finally submitted to them. A judge must not defeat the purpose of these provisions by comment on the evidence during the trial but must also keep an open mind until he has had an opportunity to hear all the evidence. Moreover, comment should be expressly labeled as the judge's opinion, and the jury advised that it may be disregarded; questions are not so labeled, and when they convey the judge's opinion of the credibility of a witness, there is grave danger not only that they may induce the jury to form an opinion before the case is finally submitted to them, but that the jury will substitute the judge's opinion for their own. The judge, therefore, may not ask questions to convey to the jury his opinion of the credibility of a witness. (*People* v. *Huff,* 134 Cal.App.2d 182, 188 [285 P.2d 17].) Nor should he intervene so extensively in behalf of the prosecutor as to align himself with the prose-

cutor in the minds of the jury. (*People* v. *Robinson,* 179 Cal. App.2d 624, 633-637 [4 Cal.Rptr. 50].)

In the present case the trial judge, over defendant's objection, examined him extensively as to events immediately preceding the shooting, interrupting the deputy district attorney's cross-examination to do so. The judge questioned defendant closely to clarify inconsistencies between his testimony on the stand and statements he had previously made. After defendant was excused as a witness and Doctor Brandmeyer was about to take the stand, the judge recalled defendant and once again questioned him as to his memory of the shooting. After defendant had been excused a second time and before Doctor Brandmeyer's examination began, the parties retired to chambers for a conference.

During the conference the judge stated that he did not believe defendant's testimony about his lapse of memory and that he believed that defendant went to his wife's apartment the second time, not to discuss visitation rights, but to fight with Brown. The court said: "He didn't think there was going to be any discussion . . . I'm not going to swallow that at all. . . . I'm not going to let the jury swallow it." The judge, however, had stated earlier: "It seems to me rather strange that this young man can remember up to the point where he not only sees a man reach for his hip pocket, but after that he reasons in his mind, 'I'm about to be killed unless I can act,' and before he can act, he forgets everything. It seems to me that was a very convenient time to start suffering from amnesia. I am frank to say I don't believe it. I'm not trying the facts in this case. The defendant under the constitution is entitled to a jury by twelve people, and they might believe it, and if they do believe it, he is entitled to that, and I would a whole lot rather one guilty man go free, whether he be guilty or not, than I would rather ten guilty men go free and one innocent man be convicted, in my book.

"Now my view is simply this, gentlemen. I will tell you that very frankly. I don't think a courtroom is a place to play a checker game. I don't think a courtroom is a football contest or boxing contest. I don't think the courtroom is a contest for the purpose of seeing who is the smarter lawyer, or who can persuade the jury best, at all. I think the courtroom is a place to see that justice is done, and I think a courtroom is a place to bring out all the facts that bear upon the subject, and to bring them out fairly and impartially to the end that justice may be approximated as closely as may be by the jury.

That is why I asked this young man some questions to find out just at what point he claims he started suffering this loss of memory and as I have said, in the absence of the jury and on this record, I can't quite accept all of his story, but I don't know what the jury's going to think about it, and I'm not going to tell the jury what they ought to think about it. I'm going to ask questions as I see fit, to give the jury all the light that they can have in order that they may derive,— arrive at their own opinions. . . ."

These statements were made out of the presence of the jury and did not induce defendant to abandon any of his defenses.

Following the conference in chambers the judge examined Doctor Brandmeyer at great length concerning petitioner's alleged retrograde amnesia. Defendant's motions for a mistrial and a new trial based partly on the judge's questioning defendant and Doctor Brandmeyer were denied.

Although the judge questioned defendant and Doctor Brandmeyer at great length "The mere fact that the judge examined . . . at some length does not establish misconduct." (*People* v. *Corrigan, supra,* 48 Cal.2d 551, 559; *People* v. *Montgomery, supra,* 47 Cal.App.2d 1, 18.)

It is ordinarily better practice for a trial judge to let counsel develop the case and to undertake the examination of witnesses only when it appears that relevant and material testimony will not be elicited by counsel. (See *People* v. *Campbell,* 162 Cal.App.2d 776, 787 [329 P.2d 82].) Even if the testimony elicited by the judge's questions, however, would probably have been elicited by counsel, that fact alone does not render the judge's questions improper.

Defendant contends that the judge's comments in the conference in chambers disclosed his purpose to invade the province of the jury by inducing it to disbelieve defendant's evidence about his lapse of memory and that the judge accomplished that purpose by improper questioning of defendant and Doctor Brandmeyer.

It is immaterial that the judge did not believe defendant's evidence or even that his purpose was to induce the jury not to believe it so long as he sought to accomplish that purpose by getting the truth established according to the governing rules of law. Certainly there is nothing improper in the judge's candidly advising counsel in chambers of his disbelief in defendant's evidence. Nor is there anything improper in his questioning witnesses to induce the jury to share that disbelief, if his questions are designed, as

the judge stated in the conference in chambers, "to bring out all the facts that bear upon the subject, and to bring them out fairly and impartially to the end that justice may be approximated as closely as may be by the jury."

The questions the judge asked defendant were designed to distinguish clearly the facts that defendant remembered and the facts that he did not remember and to clarify the inconsistencies between his testimony and his previous statement to his naval superiors. The questions the judge asked Doctor Brandmeyer were designed to get a full explanation of the nature and causes of retrograde amnesia. A careful examination of the record convinces us that the judge's questions were not a guise for conveying to the jury the court's disbelief in defendant's evidence but were asked to get the truth established, and that they fairly and impartially brought out relevant and material testimony. Moreover, the judge instructed the jury that any intimation in his questions or the questions of counsel that certain facts were or were not true must be disregarded, and he adequately instructed them that they were the exclusive judges of the effect and value of the evidence.

Defendant also contends that the court erred in curtailing the *voir dire* examination of the jurors. The court conducted an elaborate *voir dire* examination and then allowed each party to examine the prospective jurors. Defense counsel attempted to ask the jurors the branch of military service with which they had been affiliated, whether the juror would be prejudiced by reason of the fact that there was a "divorce in this case," and whether any of the jurors were related to a law enforcement officer.

The court refused to permit these questions on the ground that they were asked to obtain information for peremptory challenges. "It is now well settled in this state that a juror may not be examined on *voir dire* solely for the purpose of laying the foundation for the exercise of a peremptory challenge." (*People* v. *Ferlin*, 203 Cal. 587, 598 [265 P. 230].) If special circumstances in the present case made defendant's questions relevant to show bias or other grounds for a challenge for cause he should have informed the court of his reasons for asking the questions. (*People* v. *Hinshaw*, 40 Cal.App. 672, 674 [182 P. 59].)

Defendant contends that the court erroneously ruled out of order a question designed to establish that after defendant's first visit Brown stated: "[i]f Rigs comes back

I'll tear him apart." It is conceded that defendant did not hear this threat. At the time the question was asked there was no evidence in the record that Brown may have been the aggressor or that defendant was acting in self-defense. Evidence of an uncommunicated threat is proper only after a foundation has been laid tending to show that the victim was the aggressor. (*People* v. *Spraic*, 87 Cal.App. 724, 729-730 [262 P. 795] ; see 1 Wigmore, Evidence [3d ed.] 552.) The question was not reasked after such foundation had been laid.

 Defendant contends that the court erred in ruling out of order a question designed to elicit Brown's tone of voice when he stated that he was coming out to see defendant. After the question was asked the court stated that Brown's tone of voice was irrelevant, but the answer to the question, that Brown's tone was "harsh," was not struck and remained in the record for the jury's consideration.

 Defendant objects to the court's instruction that after an interlocutory divorce "[neither spouse] without consent of the other may legally invade the other's separate home, nor eject a guest therefrom, nor exercise any dominion over it. The fact that one of the spouses is given the right of visitation with a child in the custody of the other does not affect the rule just stated."

The correctness of the instruction is not disputed. Defendant insists, however, that in view of the refusal to instruct that defendant had a right to visit his child, the instruction may have misled the jury into believing that defendant's conduct in approaching his wife's apartment was unlawful as a matter of law.

There was evidence that defendant contemplated the use of force to visit his child. The court, therefore, properly instructed the jury that defendant did not have the right to use force. Defendant's proposed instruction stated that defendant had a right to visit his child, but failed to state that he could not use force to do so, and was therefore properly refused.

 After deliberating for some time, the jury requested further instructions on intent and transfer of intent. The court repeated the instructions on transferred intent and gave examples illustrating the application of the rules. In the examples the court used itself and members of the jury as parties. The foreman then indicated that he understood the instructions but that he was not certain how to apply them to the present case. The court replied that the ap-

plication of the law to the facts was the province of the jury. There is no merit in defendant's contention that the court erred in using examples in which members of the jury were parties and in referring to the foreman as "My friend." Defendant also contends that the court erred in repeating the instructions on transferred intent only and failing to repeat the instructions on intent, on the ground that this failure may have been interpreted by the jury as a mandate to find intent and transfer it. This contention is without merit. The court's earlier instructions fully and adequately instructed the jury on the law of intent and the foreman indicated that the repeated instructions answered the question asked by the jury. The court's duty is fully performed if the additional instructions answer the question of the jury. (*People* v. *Finali,* 31 Cal.App. 479, 489 [160 P. 850]; *cf. Olson* v. *Standard Marine Ins. Co.,* 109 Cal.App.2d 130, 140-141 [240 P.2d 379].)

The court instructed the jury to return to court when it had arrived at a verdict on any of the three counts. The jury first returned a verdict finding defendant guilty of assault against Mrs. Rigney and Sharon Brown. The jury then returned to the jury room and found defendant guilty of assault with intent to kill Brown. Defendant did not object to this procedure when the court first suggested it. In his motion for a new trial and on appeal he contends that under Penal Code, section 1164, the jury must be discharged after any verdict has been announced. Section 1164 provides:

"When the verdict given is such as the court may receive, the clerk, or if there is no clerk, the judge or justice, must record it in full upon the minutes, and if requested by any party must read it to the jury, and inquire of them whether it is their verdict. If any juror disagrees, the fact must be entered upon the minutes and the jury again sent out; but if no disagreement is expressed, the verdict is complete, and the jury must be discharged from the case."

This section does not preclude the jury's making a separate return of its verdict on each count when more than one count is charged. Penal Code, section 954, expressly vests in the court the power to have separate counts tried separately. There is no reason why the court should not have the jury's verdicts on each count returned separately. Such procedure is followed in the federal courts. (See *United States* v. *Cotter,* 60 F.2d 689, 690-691.) In New York, which has a statute

identical with Penal Code, section 1164 (New York Code of Criminal Procedure, § 451), verdicts may be returned separately when more than one defendant is on trial. (*People* v. *Cohen*, 223 N.Y. 406 [119 N.E. 886, 893-894].)

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., McComb, J., White, J., and Dooling, J., concurred.

Schauer, J., concurred in the judgment.

PETERS, J.—I dissent. In my opinion the record in this case demonstrates that the trial judge aligned himself with the prosecution by assuming the role of prosecutor, and clearly indicated to the jury his disbelief in the main defense of the defendant. The two witnesses were constantly interrupted by the trial judge, who then exhaustively, argumentatively and repetitiously examined them almost to the complete exclusion of the district attorney. Such examination was officious and unnecessary. It necessarily deprived the defendant of that fair and impartial trial guaranteed to him by the Constitution of this state and of the United States.

The majority opinion correctly and fairly states the facts. It also sets forth the general principles applicable to the examination of witnesses by the trial judge, and briefly mentions the limitations on that power. The majority opinion correctly points out that while a trial judge, in a criminal case, has the power and duty to elicit and to clarify the testimony he "must not become an advocate for either party or under the guise of examining witnesses comment on the evidence or cast aspersions or ridicule on a witness." It is also pointed out that comment on the evidence in the guise of questions should not be indulged in during trial, and that the trial judge may not, properly, ask questions casting aspersions on the credibility of any witness. It is also the law that the trial judge should not, by his questions, distort the testimony nor engage in partisan advocacy.

In my opinion the record demonstrates that all of these rules were violated. The record shows that defendant's defense was that he acted in self-defense up to a point, and that he then suffered a loss of memory. After the defendant testified as to the claimed loss of memory, and while the prosecutor was cross-examining, the judge simply took over

that cross-examination. His questions covered the pertinent periods time and time again, and embraced much of the material already brought out by the prosecution. After the prosecutor had concluded his examination, the judge took over again, and again covered the same field that he had already covered at great length. After the defendant had been removed from the stand the judge recalled him and again subjected him to a grueling cross-examination. All objections by defense counsel to these tactics were overruled. The questions were partisan, repetitive and argumentative, and some of them ridiculed the witness.

So far as the conference in chambers is concerned, at which defendant and his counsel were, of course, present, the sole question involved was whether Doctor Brandmeyer could give his opinion as to whether defendant was suffering from retrograde amnesia. After properly ruling that the doctor could testify on the subject, the trial judge then took 38 pages of the transcript to lecture the defendant and his counsel on how ridiculous he thought this defense was. Whether intended as such or not, such tactics could not fail to intimidate the defendant and his counsel.

After this colloquy in chambers Doctor Brandmeyer was called to the stand. The doctor, who was a reputable navy psychiatrist, was defendant's chief witness. The court was sarcastic and unfair to this witness. Even during his direct examination the trial judge took over and asked questions permissible only as cross-examination. If the prosecutor had thus interrupted defense counsel it would have been error, and it was equally wrong for the trial judge to have used such tactics. The record shows that the judge simply took over the cross-examination of this key witness. When the defense took the doctor on redirect to try to repair the damage caused by the judge's questions, as soon as the doctor gave an opinion favorable to the defense, the judge broke in and cross-examined in a fashion so as to ridicule that opinion.

Undoubtedly the trial judge tried to be fair, and undoubtedly his motives were of the best, but his examination of these witnesses was such that it ridiculed the defendant's defense, and obviously was aimed at inducing the jury to disbelieve that testimony. This was prejudicial. These errors clearly denied defendant the fair trial to which he was entitled. I would reverse the judgment.