Opinion
MARTIN, J.
Defendant is charged with violation of Health and Safety Code section 11550 (being under the influence of narcotics). She appeals from an order of the Stockton Municipal Court (Judge Fran-sen) denying her motion to suppress evidence.
*1111 There is no settled statement. The appeal is submitted upon a reporter’s transcript of the suppression hearing. The transcript discloses the following basic facts.
On the evening of December 29, 1978, at approximately 9:15 p.m., Officer Ellis of the Metropolitan Narcotics Task Force, accompanied by other officers, had the residence of Tito Parenti at 734 East Lindsay Street, Stockton, under surveillance by reason of information received daily from confidential, reliable informants that narcotic transactions were being carried out at that location. Tito Parenti was known to be subject to probation condition search.
After observing several people entering the house and remaining for a short period and then departing in different vehicles, the officers went to the front door, knocked, and announced, “Police officers.” They thereupon heard persons running about inside the house. Officer Ellis then ran to the back door to prevent anyone from escaping and observed one Ed Valentine about to exit the house by the back door. When he saw Officer Ellis, he turned around and bolted back into the house. He was later found hiding in a closet.
Officer Ellis entered the house by the back door pursuant to Tito Parenti’s probation-search condition. He and the other officers then secured everybody in the house and took them to the front room while search was conducted for evidence of narcotic activity.
Considerable narcotic paraphernalia, balloons, hypodermic syringe, needles and tie rags for tying off the arm were found on the kitchen table. Balloons were found all around the floor and in the garbage cans. Burned books of matches, which are used to cook the heroin, were also thrown on the floor. All of these items were identified by Officer Ellis as the type employed for using and for packaging of narcotics. In addition, 10 kilos of heroin were found in the front room.
Officer Ellis, the only witness for the People who testified at the suppression hearing, was qualified as being trained and experienced in determining whether persons are under the influence of narcotics, and in identifying narcotic paraphernalia.
After finding the heroin and the narcotic paraphernalia, the five persons found in the house were observed for evidence of narcotic influence, including defendant. Officer Ellis observed her from a distance of *1112 about three feet, and determined from that distance that her pupils were constricted. Although the light was dim, the officer was able to make that plain view observation. He then approached defendant more closely and observed what he identified as recent puncture wounds on the side of her neck.
Contention on Appeal
Defendant advances the following argument on this appeal:
Being a mere visitor in the house being searched under the search condition, defendant was illegally detained by reason of the officer’s having no articulable facts suggesting criminal activity on her part.
Issue
Under what circumstances can police officers, legally in a house pursuant to a probation-search condition applicable to the owner, detain everyone found in the house?
Discussion
The facts of this case disclose more than ample “articulable facts” that suggested that criminal activity was occurring on the premises to satisfy the requirements of In re Tony C. (1978) 21 Cal.3d 888 [148 Cal.Rptr. 366, 582 P.2d 957], even as to the defendant.
In In re Tony C., supra, the court set forth the “articulable facts” rule for detentions. There the court stated (at pp. 892-893):
“It is settled that circumstances short of probable cause to make an arrest may justify a police officer stopping and briefly detaining a person for questioning or other limited investigation.... The guiding principle, as in all issues arising under the Fourth Amendment and under the California Constitution (Cal. Const., art. I, § 19...) is ‘the reasonableness in all the circumstances of the particular governmental invasion of a citizen’s personal security.’ ... [¶] [I]n order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively enter *1113 tain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience, ... to suspect the same criminal activity and the same involvement by the person in question [and authorities cited therein].”
The “articulable facts” within the knowledge of the police in this case that would have justified their detaining and questioning everybody on the premises are as follows:
1. Information received daily from the confidential, reliable informants that there was drug trafficking at that house;
2. Before entering the house pursuant to the probation-search condition, the officers saw several people going in and remaining for a short period and leaving in different vehicles;
3. The officers heard the scurrying around inside of the house when they announced themselves as police; and
4. One occupant of the house was observed trying to bolt out of the back door when the police knocked at the front door.
The police would have been justified in detaining and questioning the defendant for narcotic activity, since they did have specific and articulable facts suggesting criminal activity on the part of all present, including the defendant. The finding of considerable narcotic paraphernalia and 10 kilos of heroin, coupled with the above facts and the plain-sight observations[1] of constricted pupils and recent puncture wounds would have given the officers probable cause for arresting the defendant. But unfortunately, Officer Ellis never once in his answers at the suppression hearing mentioned any of these facts as the reasons for detaining defendant. Instead, his position was that there was no detention and everyone was free to leave except the probationer.
“Q. Is that your general policy, that when you go into a residence like that, everybody is free to leave except the person that you have—are you telling the court that, Officer?
*1114 “A. Is it our policy to let them leave?
“Q. Yeah.
“A. If you have no reason to detain them I don’t see how you can hold them.”
Yet, in response to the very next question and others that followed, Officer Ellis answered:
“Q. I want to know if it’s your policy, when the Metropolitan Task Force goes in on a search like this, if it’s your policy to let these people leave immediately?
“A. No, I want their names.
“Q. So they had to stay long enough to identify themselves to you, is that correct, sir?
“A. Yes, sir.”
Later, after he testified about the contraband that was found inside the house, Officer Ellis was asked:
“Q. Did you or did you not want to know this woman’s name when you went into the house?
“A. I would have before she would have left, yes, sir.
“Q. And your sole reason that you are able to articulate for the record today for doing that, is that there was some heroin found in another room, that you don’t know whether it was in her view or not, is that right?
“A. Yes, sir, and future prosecution of the persons in the house.
“Q. You wanted to question her in connection with possible prosecution of her, is that right?
“A. Not her, no, sir.”
*1115 And on direct examination, in answer to a question about what he did upon entry into the house, Officer Ellis answered: “Secured everybody, and took them into the front room of the house.... ” Thus, contrary to Officer Ellis’ posture at the suppression hearing, it is clear that everybody was not free to léave.
The recent United States Supreme Court decision of Michigan v. Summers (1981) 452 U.S. 692 [69 L.Ed.2d 340, 101 S.Ct. 2587], is relevant to the facts of this case. In Summers, the officers were about to execute a warrant to search the defendant’s residence for narcotics. Meeting the defendant as he was leaving the premises, the officers had him return with them and detained him while they searched the premises. After narcotics were found, the defendant was arrested and searched. Heroin was found on his person.
In upholding the detention and search, the court stated: “It is also appropriate to consider the nature of the articulable and individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant. We have already noted that the detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant. The existence of a search warrant, however, also provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.” (Id., at p. 703 [69 L.Ed.2d at p. 350, 101 S.Ct. p. 2594].)
Since the defendant here was not an occupant of the house to be searched but only a visitor, she argues that the facts of this case do not bring it within the Summers exception to detain and arrest and her detention was therefore illegal.
It cannot be disputed that requiring all present to remain until they identify themselves is a detention. This policy indiscriminately restricts the freedom of all—family, friends and strangers—who happen to be on the premises when the search is triggered. Such detention is not based on the imprimatur of a “neutral and detached magistrate’s” finding of *1116 probable cause that criminal activity is occurring in the house to be searched. The court in Summers, supra, emphasized that it was only this factor of a magistrate’s imprimatur that permitted the detention of all occupants in the house.
From the reading of Summers, two necessary requisites for such detention are: (1) A valid search warrant,[2] and (2) the person detained is an occupant[3] of the premises described in the search warrant, at least in the factual context of Summers.
Here, there was no search warrant nor was the defendant an occupant of the house being searched. The search was based on the waiver of Fourth Amendment rights by the probationer. (People v. Mason (1971) 5 Cal.3d 759 [97 Cal.Rptr. 302, 488 P.2d 630]; People v. Palmquist (1981) 123 Cal.App.3d 1 [176 Cal.Rptr. 173].) The persons detained were not occupants; they had no proprietary connection to the house being searched. As visitors, they had only a fortuitous presence in the house when the search was initiated.
Thus, although there were more than sufficient “articulable facts” known to Officer Ellis to have justified the defendant’s detention, he did not articulate them at the suppression hearing as the reasons why he detained the defendant. Every question asked Officer Ellis as to why he detained the defendant drew a response that was legally inadequate under both Tony C, and Summers even though there were sufficient facts to detain had he just stated them when asked.[4]
*1117 Had this been a question of probable cause to arrest, form over substance would not prevail. An arrest for the wrong offense does not affect its validity if probable cause did, in fact, exist to arrest for another offense. (People v. Lewis (1980) 109 Cal.App.3d 599, 609 [167 Cal.Rptr. 326].) That is not the law as to detentions. A detention, as *1118 here, otherwise valid, is illegal if the reasons articulated are improper. “A detention may not be justified after the fact on a basis not relied on by the officer.” (People v. Bower (1979) 24 Cal.3d 638, 647 [156 Cal.Rptr. 856, 597 P.2d 115].) This is one situation where a “rose by any other name does not smell just as sweet.”
*1119 If we were writing on a clean slate, we would give proper attention and weight to the facts and less to the manner in which the officer articulated his reasoning for detaining the defendant, but we are not.
The order denying defendant’s motion to suppress evidence is reversed.
Dozier, P. J., and Darrah, J., concurred.

 Plain-sight observations are not searches. As has been said: “To observe that which is open and patent is not a search.” (People v. Jaurequi (1956) 142 Cal.App.2d 555, 561 [298 P.2d 896].)

The Summers court in footnote 17 stated that “comparable police conduct may be justified by exigent circumstances in the absence of a warrant.” (452 U.S. 692, 702 [69 L.Ed,2d 340, 350, 101 S.Ct. 2587, 2594].)

In Summers, supra, “occupant” appears to be used by the court in the legal sense of a “person having possessory rights” on the premises, as the court makes reference to “persons who resided there,” and states that “the detention in this case was in respondent’s own residence.” (Id., 452 U.S. at pp. 701-702 [69 L.Ed.2d at p. 349, 101 S.Ct. at p. 2593].) (See also, Black’s Law Dict. (4th ed. 1951) p. 1230.)

This case is another example of an absurd result, and one inimical to the cause of justice, arising from inadvertence of the prosecuting deputy. It appears almost certain that, the officer-witness did suspect criminal narcotic activity by all persons present in the house, and reasonably so.
Unfortunately and inadvertently, the prosecuting attorney forgot to ask him the simple question of what he suspected.
It is regrettable that the trial judge did not ask the question himself when the inadvertent omission became obvious. Trial courts now recognize a responsibility to the criminal defendant to protect him against inadequate representation by counsel by calling to his attention, or remedying by court questioning, inadvertent critical omissions in *1117 eliciting testimony that prevent a defense being tried on its merits.
Some trial courts, mired in tradition, consider themselves powerless to remedy obviously inadvertent omissions by the prosecutor which deprive the trier of fact of the opportunity to decide the issues of the case on their merits (and the people of the right to have the case itself decided on its merits).
This maidenly reluctance by trial courts is no longer the law of California as the following cases demonstrate:
1. In People v. St. Andrew (1980) 101 Cal.App.3d 450, 456-457 [161 Cal.Rptr. 634], the court stated: “While it is not a judge’s function to substitute for counsel in the trial of a case, the judge is ‘“not a mere umpire presiding over a contest of wits between professional opponents, but a judicial officer entrusted with the grave task of determining where justice 'lies under the law and the facts .... ’””
2. In People v. Carlucci (1979) 23 Cal.3d 249, 256 [152 Cal.Rptr. 439], our State Supreme Court declares: “... the.judge neither forfeits his right nor abandons his duty to seek the truth for the reason that he is the trier of fact. To the contrary, if questions remain in his mind after the witnesses 'have made their statements, he should affirmatively clarify matters in order that he may render the best possible informed verdict. (See McCartney v. Commission on Judicial Qualifications (1974), 12 Cal.3d 512 [116 Cal.Rptr. 260, 526 P.2d 268].)
“The principle has been well stated by Mr. Witkin in 4 California Procedure (2d ed. 1971) Trial, section 185 at pages 3005-3006, in quoting an earlier appellate opinion: ‘The rule that a trial judge’s unwarranted interference with the handling of the case is misconduct ... is sometimes distorted into a prohibition against any participation in the trial contrary to the desires or strategy of counsel. This is a complete misconception. “It apparently cannot be repeated too often for the guidance of a part of the legal profession that a judge is not a mere umpire presiding over a contest of wits between professional opponents, but a judicial officer entrusted with the grave task of determining where justice lies under the law and the facts between the parties who have sought the protection of our courts. Within reasonable limits, it is not only the right but the duty of a trial judge to clearly bring out the facts so that the important functions of his office may be fairly and justly performed.'” (Estate of Dupont (1943), 60 Cal. App.2d 276, 290 ...).’”
3. More eloquently, “the same principle is echoed in Gitelson, A Trial Judge’s Credo (1966) 7 Santa Clara L.Rev., pages 7, 13-14: ‘There are still some counsel and trial judges who dispute the right and duty of a trial judge to participate in the examination of witnesses. Their denial of the right and duty of a trial judge to so do is without substantial support in the law of this state. The law of this state confers upon the trial judge the power, discretion and affirmative duty, predicated upon his primary duty and purpose “to do justice," to, in any proceeding, whether criminal or civil, with or without a jury, participate in the examination of witnesses whenever he believes that he may fairly aid in eliciting the truth, in preventing misunderstanding, in clarifying the testimony or covering omissions, in allowing a witness his right of explanation, and in eliciting facts material to a just determination of the cause.’” (People v. Carlucci, 23 Cal.3d at p. 256.)
4. Again in Carlucci, at page 255, the court iterates: “.... Numerous courts, including our own, have recognized that it is not merely the right but the duty of a trial judge *1118 to see that the evidence is fully developed before the trier of fact and to assure that ambiguities and conflicts in the evidence are resolved insofar as possible. (See People v. Bowman (1966) 240 Cal.App.2d 358, 382 [49 Cal.Rptr. 772].) As we expressed at length in People v. Rigney (1961) 55 Cal.2d 236, 241 [10 Cal.Rptr. 625, 359 P.2d 33, 98 A.L.R.2d 186]: ‘A trial judge may examine witnesses to elicit or clarify testimony [citations omitted]. Indeed, “it is the right and duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence.”’ Similarly, as noted in People v. Lancelotti (1957) 147 Cal.App.2d 723, 730 [305 P.2d 926]: ‘[I]t has been repeatedly held that if a judge desires to be further informed on certain points mentioned in the testimony it is entirely proper for him to ask proper questions for the purpose of developing all the facts in regard to them. Considerable latitude is allowed the judge in this respect as long as a fair trial is indicated both to the accused and to the People. Courts are established to discover where lies the truth when issues are contested, and the final responsibility to see that justice is done rests with the judge.”'
5. It has been held'that it is the duty of a trial judge to see that a case is “not decided by mere inadvertence” (Hellings v. Wright (1916) 29 Cal.App. 649, 665 [156 P. 365]), or by “want of attention” (Bare v. Parker (1921) 51 Cal.App. 106, 108 [196 P. 280]).
. 6. The trial court has the power ‘““to call attention to omissions in evidence ...” which are likely to result in a decision other than on the merits....'" (Retes v. Superior Court (1981) 122 Cal.App.3d 799, 807 [176 Cal.Rptr. 160], italics added.)
7. It is the obligation of a trial judge to see that the trial is “fair” both to the defendant and the People. “[I]t is the right and duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence.” (People v. Corrigan (1957) 48 Cal.2d 551, 559 [310 P.2d 953]; see also, People v. Rigney (1961) 55 Cal.2d. 236 [10 Cal.Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186]; People v. Bonville (1968) 268 Cal.App.2d 107 [73 Cal.Rptr. 741]; People v. Ward (1968) 266 Cal.App.2d 241 [72 Cal.Rptr. 41]; People v. Rodriguez (1970) 10 Cal.App.3d 18 [88 Cal.Rptr. 789].)
8. It is also proper for a trial judge to question witnesses himself for the purpose of eliciting or clarifying testimony on material points. (Evid. Code § 775; People v. Corrigan, supra, 48 Cal.2d 551; People v. Rigney, supra, 55 Cal.2d 236; People v. Bonville, supra, 268 Cal.App.2d 107; Witkin, Cal. Evid. (2d Ed. 1966) §§ 1105-1107.) The cases establishing this principle are all cases where it was the defendant who was complaining that the questioning by the judge aided the prosecution.
9. Note that at pages 434-435, People v. Moore (1970) 13 Cal.App.3d 424 [91 Cal.Rptr. 538] states: “In People v. Madden, supra, 2 Cal.3d 1017 [88 Cal.Rptr. 171, 471 P.2d 971], the trial court (according to the reporter’s transcript) raised the issue (in re a ground for suppression of evidence) on its own motion .... ”
Thus, it is now clear that the trial judge need not sit in silent anguish during hearings on preliminary motions while the prosecutor inadvertently fails to ask a question which the trial court knows is going to prevent his decision on the motion on its merits. He may ask the omitted question himself.
Some of the precipitous loss of public confidence in the courts created by the ubiquitous application of the exclusionary rule can be regained if the trial courts will utilize *1119 their power to avoid exclusion of critical evidence because of prosecutorial inadvertence at hearings in respect to exclusion of evidence.
Furthermore, it will, in a slight degree, restore the neutrality of the judiciary as between the defendant (where the court has an encompassing duty to ensure adequate legal representation at preliminary motion hearings and at trial) and the People (where the trial court is not being required to do anything but only be reminded of its power to avoid fatal effects of prosecutorial inadvertency at hearings on preliminary motions only).