[Crim. No. 6424. First Dist., Div. Two. Sept. 30, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. MAX WARD, Defendant and Appellant.

Harley C. Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and Michael J. Phelan, Deputy Attorneys General, for Plaintiff and Respondent.

AGEE, J.—On May 19, 1966 Max Ward, Carl Black, Norman Call and two others were indicted for conspiring to murder Dow Wilson (count 1) and for murdering him on April 5, 1966 (count 2).

Call was tried separately and convicted of first degree murder. He received a life sentence. The joint trial of Ward and Black commenced thereafter. After a jury was selected and

while the prosecution was putting in its case in chief, Black's motion for a severance was granted. Count 1 (conspiracy) was then dismissed as to Ward and the trial proceeded against him alone on count 2 (murder).

Following jury conviction of first degree murder, Ward waived a jury trial as to the penalty phase and was sentenced by the trial judge to life imprisonment. This appeal is from the judgment of conviction. The claims of error arising prior to the trial proper will be discussed first.

### Denials of Appellant's Peremptory Challenges to Trial Judge

On August 1, 5, and 18, 1966, appellant *orally* moved, under the provisions of Code of Civil Procedure section 170.6, to peremptorily challenge the trial judge to whom the action was assigned. *None* of these motions were "supported by affidavit or oral statement under oath," as required,[1] and were therefore ineffective. (*People* v. *Ashley* (1963) 59 Cal.2d 339, 360 [29 Cal.Rptr. 16, 379 P.2d 496].)

In his closing brief, appellant states that his motion of August 5 complied with section 170.6 in that he "relied upon the swearing of Mr. Davis [Black's attorney] re the *joint* motion to disqualify." (Italics added.) There is *nothing* in the record to support the statement that Black's motion was *joint.*

The minutes of August 5, in their entirety, are as follows: "Thereupon George Davis and Lois Prentice [one of appellant's attorneys] *each* interposed a motion to disqualify the Court as provided by section 170.6 C.C.P. as to their respective clients. Thereupon, after George T. Davis, counsel for the defendant Black was sworn, the Court denied the motion*s* to disqualify the Court as provided by section 170.6 C.C.P. as to each defendant." (Italics added.)

Furthermore, the record is completely *silent* as to *what* was sworn to by Mr. Davis. (See fn. 1 herein as to what shall be contained in the required "oral statement under oath.")

■ The following rule ·is well settled: An order of the trial court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the

---

[1]Section 170.6 then provided in pertinent part that such motion must. be "supported by affidavit or an oral statement under oath that the judge before whom such action or proceeding is pending or to whom it is assigned is prejudiced against any such party or attorney or the interest of such party or attorney so that such party or attorney cannot or believes that he cannot have a fair and impartial trial or hearing before such judge."

record is silent, and error must be affirmatively shown.. (3 Witkin, Cal. Procedure (1954) Appeal, § 79, p. 2238; *Walling* v. *Kimball,* 17 Cal.2d 364, 373 [110 P.2d 58]; *Coleman* v. *Farwell,* 206 Cal. 740, 741-742 [276 P. 335].)

### Alleged Misconduct of Black's Counsel

■ During the *voir dire* examination of the jury, Black's counsel, George T. Davis, stated that, although appellant had. the right to do so, "I will excoriate him if he doesn't take the, witness stand, . . ." Other similar remarks were made by Davis. .

Appellant argues that any comment on a defendant's failure to testify in a criminal case is error. (*Griffin* v. *California,* 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229].). Although the court denied appellant's motion for a mistrial on this ground, it admonished Davis to refrain from any further comments. of such nature and warned him that it would be misconduct for him to do so.

Prior to any such comments by Davis, appellant's counsel had stated to the court that appellant intended to take the stand, and the fact is that he did take the stand and deny being in any way involved in the killing. There is nothing in the record to justify a conclusion that he was impelled to testify by any references made by Davis to appellant's right to invoke the Fifth Amendment. He thus sustained no prejudice by the Davis comments. (See *People* v. *Ing,* 65 Cal.2d. 603, 610-611 [55 Cal.Rptr. 902, 422 P.2d 590]; *People* v. *Perez,* 65 Cal.2d 615, 620-621 [55 Cal.Rptr. 909, 422 P.2d 597].)

■ Appellant also complains of certain comments and questions by Davis during said *voir dire* examination which presupposed that the evidence of appellant's guilt might be so great as to "overflow" to his client, Black.

A typical question by Davis, to which, incidentally, no objection was made, is as follows: "If as this case progresses and evidence of a rather emotional, highly emotional and disturbing nature—because actually pointing a gun at a human being and deliberately waiting and shooting him has got to be an emotion—has to be evidence with an emotional impact. Whether you believe it or not is another story. But if you listen to that kind of evidence and you finally decide that you believe it and you find Mr. Ward guilty of cold, premeditated murder in the streets of the city of San Francisco, do you think you will be able to hold that evidence over on one side and not let it overflow against Mr. Black, assuming that no..

evidence of that kind, of anything like that, applies to Mr. Black? Do you think you can make that kind of a separation in your mind?''

Appellant's counsel himself followed the same line of inquiry. A typical question of his is as follows: ''Now, if the evidence shows in this case that that man over there—you understand we represent Max Ward—that that man over there met with some other persons involved in this case and talked about dumping someone, the decedent, Dow Wilson, but the evidence doesn't show any participation in those meetings by Mr. Ward, you will consider that on the charge of conspiracy?''

The trial judge was alert at all times during the selection of the jury, which ran into the fourth day of the trial, to advise the jury that any comments or insinuations by respective counsel during the *voir dire* examination were not evidence and should not have any influence upon their ultimate decision.

The judge also admonished the jury panel as follows: ''In this case, when the case is submitted to the jury, the jury may find either or both of the defendants not guilty or guilty. It is not a question of both being guilty or both being innocent at all.''

From our consideration of the entire record we have concluded that the ''tug of war'' engaged in by respective counsel for Black and appellant did not result in prejudice to appellant and that the trial judge's prompt rulings and admonitions kept the record clear of reversible error. His refusal to declare a mistrial was therefore proper and not an abuse of discretion. ■ A motion for mistrial is addressed to the sound discretion of the trial court. It may properly be refused where the court is satisfied that no injustice has resulted or will result from the occurrences of which complaint is made. (23 C.J.S. § 961, pp. 838-839.)

### Denial of Appellant's Motion for Mistrial After Severance of Black

■ Appellant contends that the trial court abused its discretion in denying his motion for a mistrial and ordering the trial to proceed *after* the trial was severed as to Black.

Appellant argues that, during the period of the trial preceding the severance, Black's participation in the trial had resulted in prejudicing him in these respects: (1) misconduct by Davis during impanelment of jury; (2) selection of jury

not of "his own choosing"; and (3) admission of evidence of a conspiracy even though the conspiracy count was subsequently dismissed as to appellant.

We have already discussed the alleged misconduct of Davis and need not again do so.

Appellant and Black were jointly entitled to twenty peremptory jury challenges and each was entitled to five separate peremptory jury challenges. (Pen. Code, §§ 1070, 1070.5.) They agreed that each would exercise such joint challenges in rotation, with or without the concurrence of the other. Appellant's counsel exercised all of his ten joint challenges but only *one* of his separate peremptory challenges.

Although it is true that if appellant had been the *sole* defendant he would have had a total of 20 peremptory challenges (Pen. Code, § 1070), instead of the ten plus five which he had, his failure to exercise his remaining four peremptory challenges indicates his satisfaction with the jury as then constituted.

The situation is somewhat analogous to that in which an erroneous denial of a defense challenge for cause is waived by the defendant's failure to exhaust his peremptory challenges. (*People* v. *Wilkes* (1955) 44 Cal.2d 679, 686 [284 P.2d 481]; *People* v. *Goldberg* (1952) 110 Cal.App.2d 17, 23 [242 P.2d 116].)

The right to a trial by a fair and impartial jury does not encompass the right to *particular* jurors. (*People* v. *Abbott,* 47 Cal.2d 362, 372 [303 P.2d 730]; *People* v. *Howard,* 211 Cal. 322, 325 [295 P. 333, 71 A.L.R. 1385].) Appellant cites no authority to the contrary.

Evidence as to a conspiracy to murder Dow Wilson was properly admitted in evidence and could be considered even after the severance of Black was ordered and the conspiracy count was dismissed as to appellant.

It is firmly established law that conspiracy need not be pleaded as a basis for the reception of evidence which shows the existence of one. (*People* v. *Pike,* 58 Cal.2d 70, 88 [22 Cal. Rptr. 664, 372 P.2d 656]; *People* v. *Ditson,* 57 Cal.2d 415, 447 [20 Cal.Rptr. 165, 369 P.2d 714].)

*Exclusion of Prospective Jurors Professing*
*Conscientious Objection to Capital Punishment*

Appellant argues that his constitutional right to an impartial jury was violated when the prosecution was allowed to challenge for cause all prospective jurors who stated that they had conscientious objections against the death penalty.

He urges that such exclusion of this class of persons results in a jury which is more likely to convict than a jury on which such persons are not excluded.

This argument was rejected in *Bumper* v. *North Carolina*, 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788], decided June 3, 1968. The Supreme Court stated: "In *Witherspoon* v. *Illinois*, decided today, we have held that a death sentence cannot constitutionally be executed if imposed by a jury from which have been removed for cause those who, without more, are opposed to capital punishment or have conscientious scruples against imposing the death penalty. Our decision in *Witherspoon* does not govern the present case, *because here the jury recommended a sentence of life imprisonment.* The petitioner argues, however, that a jury qualified under such standards must necessarily be biased as well with respect to a defendant's guilt, and that his conviction must accordingly be reversed because of the denial of his right under the Sixth and Fourteenth Amendments to trial by an impartial jury. [Citations.] *We cannot accept that contention in the present case.* The petitioner adduced no evidence to support the claim that a jury selected as this one was is necessarily 'prosecution prone,' and the materials referred to in his brief are no more substantial than those brought to our attention in *Witherspoon.* Accordingly, we decline to reverse the judgment of conviction upon this basis." (Italics ours.)

In *Witherspoon* v. *Illinois*, 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], referred to in *Bumper, supra,* a jury found the defendant (petitioner) guilty of murder and fixed his penalty at death. The judgment was reversed, the court stating: "Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be put to death at the hands of a tribunal so selected."

The court made it clear that its decision did not affect the finding of a defendant's *guilt.* In footnote 21. it stated: "Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case." (Italics by the court.)

The *Witherspoon* decision contains this further statement on the subject: "We simply cannot conclude, either on the

basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.''

## Factual Background

Local 487 of the AFL-CIO Painters' and Decorators' Union in Sacramento was a self-governing local union. A ''Joint Committee,'' consisting of five union members and five representatives of the painting contractors, considered all employee-employer problems arising under the working agreement between the parties. This committee was attempting to reach a new agreement by July 1, 1965.

The members of the Joint Committee were also members of a Board of Trustees, which was responsible for the administration of various ''fringe benefit funds,'' designated as Pension Fund, Vacation Fund, and Health and Welfare Fund, the total thereof being over $400,000.

The Board of Trustees had hired one Sture Youngren as the administrator of the funds. During 1964 and 1965 there was considerable discussion and dissension among the union members concerning the administration of these funds.

Defendant Call was a member of the Joint Committee and the Board of Trustees as a representative of the contractors. He was not a union member. In 1965 he was chairman of both the Joint Committee and the Board of Trustees. Appellant (Ward) was also a member of both groups as a representative of the contractors.

There had been frequent requests by union members that the trustees have an audit made of the fringe benefit funds. Call always responded that an audit was not necessary because Youngren was an honest man, but that one would be made at some future time.

The murder victim, Dow Wilson, was secretary of a painters' union local in San Francisco, affiliated with District Council 16. In April 1965 he appeared at a meeting of the Sacramento local and urged that it affiliate with said council.

As an offshoot of this meeting Wilson was authorized by the Sacramento local to act as its spokesman in negotiating a new contract with the contractors. At this time Call was responsible for such negotiating on behalf of the contractors. He was also chairman of the Joint Committee.

At a meeting of the Joint Committee, Call refused to recognize Wilson's authority as a negotiator for the union and no

negotiations occurred at that meeting. Considerable hostility developed between Call and Wilson.

At a subsequent meeting, Wilson claimed that the fringe benefit funds had been mishandled and demanded an audit.

Wilson's authority as spokesman for the Sacramento local expired on July 1, 1965, when it voted to merge with District Council 16, of which one Rasnick was secretary. Thereafter negotiations between the local and the contractors were carried on by Rasnick, as the union spokesman.

With the assistance of Youngren, Call had embezzled approximately $18,000 from the fringe benefit funds. Appellant also admitted that, with Youngren's assistance, he had stolen $3,600 from these funds. When demands for an audit became more insistent, Youngren suggested that Call arrange for defendant Carl Black to make it. Call obtained the approval of the trustees to employ Black for such purpose.

Call discussed his thefts from the funds with Black and the latter agreed to conceal these in such a manner that they would not be discovered.

Although the union only authorized the payment of $250 to Black for the audit, a number of unauthorized checks totaling approximately $90,000 were paid directly to Black, or endorsed to him. The record is not clear as to how these embezzled funds were shared.

### The Dow Wilson Murder

As an appellate court is required to do, we shall view and state the record in the light most favorable to the judgment of conviction. (*People* v. *Sweeney,* 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049] ; *People* v. *Caritativo,* 46 Cal.2d 68, 70 [292 P.2d 513].)

Call, Black and Rasnick frequently discussed the trouble Wilson was causing them. It was finally concluded that Wilson would have to be killed. Black and Call agreed to try to find someone to do it. The idea of asking the International to send out a killer from Chicago was rejected. Call contacted appellant and he agreed to do the killing.

On Monday, April 4, 1966, Call was advised by Rasnick that Wilson would attend a meeting that night at the Labor Temple on South Van Ness Avenue, in San Francisco. Appellant was contacted and brought his .12 gauge shotgun to Call's apartment in Sacramento.

About 1 a.m. on April 5, Wilson came out of a bar with two other men and proceeded to where their respective cars were parked. Call had parked his car in a nearby alley and appel-

lant was in the rear seat of it with his shotgun. He shot Wilson twice from the back window on the right side of the car. Call saw Wilson fall to the pavement alongside his car after the shots were fired. Wilson died almost instantly.

### Admission of Photographs of Body of Victim

Three black and white photographs were admitted in evidence. Two of these depict Wilson's body lying at the side of his car, one of which shows the car keys in one hand. They are of probative value in showing the location where Wilson was shot down in relation to his car and corroborate Call's testimony that Wilson fell to the pavement alongside his car upon being shot.

The third photograph was used in the pathologist's testimony to assist him in describing the wounds, one of which was considerably larger than the others. The photograph was clearly admissible for this purpose. (*People* v. *Arguello* (1967) 65 Cal.2d 768, 775-776 [56 Cal.Rptr. 274, 423 P.2d 202] ; *People* v. *Darling* (1962) 58 Cal.2d 15, 20-21 [22 Cal. Rptr. 484, 372 P.2d 316].)

Whether the probative value of photographs as evidence outweighs the possible prejudicial effect is a question for the trial court to decide in the exercise of its discretion. (*People* v. *Cheary* (1957) 48 Cal.2d 301, 312 [309 P.2d 431] ; *People* v. *Carter* (1957) 48 Cal.2d 737, 751 [312 P.2d 665].)

We find no abuse of discretion here.

### The Lloyd Green Murder

About one month after the Dow Wilson murder, appellant and Call murdered one Lloyd Green, using the same plan, pattern, and modus operandi.

After Wilson's murder, Call met with Rasnick on a number of occasions. The latter told Call that Green, who was secretary of the local painters' union in Hayward, was attempting to "pick up the reins" of Wilson and that he was causing a lot of trouble among the "rank and file."

Rasnick asked Call to "set up the same conditions" for Green as he had for Wilson. Call agreed to do so and Rasnick gave him Green's Hayward address and the description of his car.

Call then contacted appellant and asked if he would "go along." Appellant said he would. They made several trips to Hayward to "look the area" over and observe Green and his car so that they would not shoot the wrong man.

On May 6, 1966, Rasnick telephoned Call and told him

there would be a union meeting that night. Call and appellant arranged to meet in Hayward. After the union meeting was over, Call drove his car into a position from where he and appellant, who was in the back seat with his shotgun, could observe Green inside. Appellant fired one shot, which hit Green in the head and killed him instantly. Call then drove appellant to the latter's pickup truck, which was parked nearby, and they went their respective ways.

■ On the admissibility of such evidence, Witkin states the rule succinctly: ''Other offenses may be admitted where they are similar to and connected with the crime charged so as to disclose a general plan or system of criminal acts. The principal purpose of such evidence is to identify the defendant as the perpetrator of the crime charged. [Numerous citations.]'' (Witkin, Cal. Evidence (2d ed. 1966) § 347.)

Evidence of a crime subsequent to the charged offense is equally admissible as that of a crime prior to the charged offense. (*People* v. *Griffin* (1967) 66 Cal.2d 459, 465 [58 Cal. Rptr. 107, 426 P.2d 507]; *People* v. *Coefield* (1951) 37 Cal.2d 865, 870 [236 P.2d 570].)

The fact that the conspiracy count was dismissed as against appellant does not alter the above rule of evidence. (See *People* v. *Pike, supra,* 58 Cal.2d 70, 88; *People* v. *Ditson, supra,* 57 Cal.2d 415, 447.)

■ As recently stated by our Supreme Court, the test of the admissibility of evidence of similar offenses offered to prove common design, plan or modus operandi is whether ''the other offenses offered to prove [such] pattern, scheme, or plan are sufficiently similar and possess a sufficiently high degree of common features with the act charged'' that ''they warrant the inference that if the defendant committed the other acts he committed the act charged.'' (*People* v. *Cramer* (1967) 67 Cal.2d 126, 129-130 [60 Cal.Rptr. 230, 429 P.2d 582]; see Evid. Code § 1101, subd. (b) for codified rule.)

■ The striking similarities between the murders of Dow Wilson and Lloyd Green justify the admission of the evidence of appellant's commission of the latter offense.

In both instances, occurring little more than a month apart, appellant served as a hired triggerman for Ben Rasnick and Norman Call in eliminating painters' union officials who refused to ''get in line.''

In both cases Rasnick made the decision that the murder was necessary and Call took care of the arrangements with appellant. In both instances Call and appellant made the same

type of preparatory trips to "check out" the victim's home, car, and union meeting hall. The circumstances of both murders were strikingly similar: both victims were shot with the same type of .12 gauge shotgun and the same particular type of .12 gauge ammunition; in each case the shots issued from the window of Call's car; finally, both murders occurred late at night after the victims' attendance at a union meeting and in the vicinity of the meeting place.

The jury was correctly instructed, in the wording of CALJIC 33, on the limited purpose for which the Green murder evidence was received and appellant makes no contention to the contrary. ·

### Admission of Evidence of Statements Made by Appellant Prior to Arrest

Undercover Officer Shierts telephoned appellant on May 11, 1966 and told him that he knew about the situation in the Bay Area concerning the painters' union difficulties and that he was "looking for work along those lines" but that he had been unable to get in touch with Normal Call.

This led to a meeting that same day between appellant and Shierts at a restaurant in Sacramento. Other plain-clothes police officers were stationed inside the restaurant.

Shierts introduced himself as "Jimmy" and said he wanted a job for big money so he could get out of California. He professed to be familiar with the murder of Wilson and stated that he knew that appellant and Call were involved in it.

Appellant told Shierts, "'Norm [Call]· is running the show,'" and that he knew that the latter would like to talk to him. When appellant asked where he could get in touch with him, Shierts replied that he "wasn't giving out any information, that I would call him, not him me." The answer caused appellant to become angry and he said to Shierts: "'Look, Jimmy, we are putting out the cash, we'll call the plays. You'll do it our way or you won't do it at all.'"

About then appellant recognized one of the plain-clothes men and said to Shierts: "'I think this guy's the law. We had better get out of here.'" As they were leaving, appellant was arrested and taken into custody by the other officers.

Appellant contends that Shierts' testimony as to the above conversation should have been excluded since he was not advised of his rights as recognized in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] and *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

 Under *Miranda* the duty of the police to advise a defendant of his rights arises "when the individual is first subjected to police interrogation while in custody at the station or otherwise deprived of his freedom of action in any significant way."[2] (*Supra,* 384 U.S. at p. 477 [16 L.Ed.2d at p. 725].) It was specifically noted by the court that "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." (*Supra,* 384 U.S. at pp. 477, 478 [16 L.Ed.2d at pp. 725, 726].)

 In the instant case the record indicates that at the time of his conversation with Shierts at the restaurant appellant was not in custody nor deprived of his freedom of action in any significant way so as to bring the *Miranda* rule into play. Clearly, appellant had not been taken into physical custody at any time during the conversation and it was not until the conversation was completed that appellant was physically restrained.

In *People* v. *Arnold* (1967) 66 Cal.2d 438, 448 [58 Cal. Rptr. 115, 426 P.2d 515], the California Supreme Court recognized that custody could occur other than by the physical deprivation of a subject's freedom of action in any significant way. It was there held that custody occurs if a suspect "is led to believe, as a reasonable person," that he is being deprived or restricted of his freedom of action under pressures of official authority. (See *People* v. *Kelley* (1967) 66 Cal.2d 232, 246 [57 Cal.Rptr. 363, 424 P.2d 947].)

There is nothing in the present case, however, which suggests that appellant, while being engaged in conversation with Shierts, was placed in a situation in which he reasonably believed that he was being deprived of his freedom of movement. Subjectively, appellant believed he was in the company of one who might be useful if further killings were necessary and he spoke to him freely as if he were a friend. In short, there were none of the coercive influences of "custody" which the *Miranda* warnings were designed to offset.

The prosecution's acknowledgment that the restaurant meeting was arranged for the purpose of arresting appellant

---

[2]The court noted in its opinion that "This is what we meant in *Escobedo* when we spoke of an investigation which focused on an accused." (*Miranda* v. *Arizona, supra,* 384 U.S. at p. 444, fn. 4 [16 L.Ed. 2d at p. 706].)

is irrelevant; the custody requirement of *Miranda* does not depend on the subjective intent of the law enforcement officer-interrogator, but upon whether the suspect is physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that he is so deprived. (See *People* v. *Arnold, supra,* 66 Cal.2d at p. 447; *People* v. *Kelley, supra,* 66 Cal.2d at p. 246.)

Accordingly, the trial court did not err in admitting into evidence Shierts' testimony concerning the statements made to him in the restaurant.

### Alleged Improper Question Asked by Judge

▌ Appellant next urges that the trial court committed prejudicial error by asking appellant an improper question. The allegedly improper question occurred in the course of the prosecution's cross-examination of appellant.

In the instant case, torn fragments of diagrams of Lloyd Green's home were found in a garbage pail at Norman Call's apartment. One of the sketches bore appellant's fingerprints. Call testified that these sketches were made by appellant on the Monday morning following the Lloyd Green murder. Call explained that he had lost his way after driving appellant to his truck and that appellant had used the diagrams to illustrate the various routes that Call could have used in getting out of town.

Appellant admitted that he drew the sketches found in Call's apartment, but claimed that he drew them as part of a discussion as to whether the murder had been committed by professionals or amateurs. On cross-examination by the prosecution appellant reiterated that explanation. In response to one specific question, appellant replied: ''The nearest I can remember is that we were discussing right in the middle of the discussion where I said that it was—I didn't believe it was a professional job, that I didn't think it was a professional that would do that. And I said it would have been so much better—all the books and things I have read about it which said they could—this would be representing a hedge right here, this little wavy line. And this would be the garage, the separate little house there, and this would be the main house.''

At that point the trial court asked ''What books have you ever read about professional killings and getaways?'' Subsequent to an overruled objection to the question, appellant answered: ''Not necessarily stated as a professional killing that way. I have read quite a few detective magazines. I have

also heard quite a few of the Shell Scott detective books written by Phillip Marlow, and read quite a few of the Mike Hammer books, 'I the Jury,' and 'My Gun is Quick,' and practically every one written by the gentleman.'' The court replied: '''All right. Proceed.''

Appellant now argues that it was prejudicial error for the court to ask this single question since it was tantamount to an expression of disbelief in appellant's testimony. On the contrary, the question was entirely proper.

■ It is well settled that a trial judge may examine witnesses to elicit or clarify testimony on material points. (*People* v. *Corrigan* (1957) 48 Cal.2d 551, 555 [310 P.2d 953]; *People* v. *Rigney* (1961) 55 Cal.2d 236, 241 [10 Cal. Rptr. 625, 359 P.2d 23, 98 A.L.R.2d 186]). While the trial judge must not act as an advocate for either party or comment upon the evidence under the guise of examining witnesses, " 'it is the right and duty of a judge to conduct a trial in such a manner that the truth will be established in accordance with the rules of evidence.' " (*People* v. *Rigney, supra,* 55 Cal.2d at p. 241; see *People* v. *Corrigan, supra,* 48 Cal.2d at p. 559.)

■ The *single question* the judge asked appellant was designed to elicit additional details concerning appellant's explanation that he had read books which convinced him that the murder was the work of amateurs and had drawn the sketches only to illustrate this theory. Since the purpose for which appellant drew the diagrams was a factor of material importance in the present case, the court's question was entirely proper in order to clarify his explanation. Examination of the record indicates that the judge's question was not a guise for conveying to the jury the court's disbelief in appellant's testimony and that it fairly and impartially brought out relevant and material testimony.

### Prejudicial Publicity and Denial of Change of Venue

■ Appellant contends that before and during the trial there was so much publicity adverse to him that he was deprived of a fair trial. From time to time his counsel would *orally* move for a change of venue but never attempted to present such a motion in the manner required by law. (See Pen. Code §§ 1033, 1034.)[3] Hence, there is nothing in the

[3]Penal Code section 1033 provides in part that ''A criminal action pending in a superior court may be removed from the court in which it is pending on application of the defendant, on the ground that a fair and

260

record upon which we can consider the point. (*People* v. *Jackson* (1964) 230 Cal.App.2d 485, 490 [41 Cal.Rptr. 113] ; *People* v. *Brown* (1960) 184 Cal.App.2d 588, 595 [7 Cal.Rptr. 717].)

### Sufficiency of Corroborating Evidence

 Appellants' final claim is that the evidence is insufficient to support his conviction, arguing that it rests upon the uncorroborated testimony of an accomplice, Norman Call.

 Penal Code section 1111 provides that a conviction may not rest upon the uncorroborated testimony of an accomplice. There must be such evidence "as shall tend to connect the defendant with the commission of the offense. . . ." However, the corroborating evidence may be slight and entitled to little consideration standing alone. It may be solely circumstantial and is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the accomplice is telling the truth. (*People* v. *Holford* (1965) 63 Cal.2d 74, 82 [45 Cal.Rptr. 167, 403 P.2d 423] ; *People* v. *Lyons* (1958) 50 Cal.2d 245, 257 [324 P.2d 556].)

 The prosecution produced an abundance of corroborating evidence. Suffice it to mention several important respects in which Call's testimony was corroborated. The witness Joey De La Cruz positively identified appellant as being at the murder scene in a car moments before the murder. De La Cruz noticed appellant look out the car window as if trying to recognize someone. De La Cruz continued on his way and moments later, heard shots coming from the direction of the car he had just seen. Thereafter he saw the car drive away.

In addition appellant made incriminating admissions to Officer Shierts which connected him with the Wilson murder. The extrajudicial admissions and statements of a defendant are proper corroborative evidence. (*People* v. *Raffington* (1950) 98 Cal.App.2d 455, 461 [220 P.2d 967], certiorari denied 340 U.S. 912 [95 L.Ed. 659, 71 S.Ct. 292] ; *People* v. *Tallent* (1948) 89 Cal.App.2d 158, 161 [200 P.2d 214].)

impartial trial cannot be had in the county."

Penal Code section 1034 provides in part that "The application for removal *must* be made in open court, and in *writing,* verified by the *affidavit* of the defendant, a copy of which application must be served upon the district attorney at least one day prior to the hearing of the application." (Italics added.)

In addition, the .12 gauge shotgun ammunition found in appellant's pickup truck was identical to that used in both murders. This ammunition was distinctive in that it possessed a particular type of shotgun "wadding" used exclusively by one manufacturer. Appellant admitted that his .12 gauage shotgun had been recently "test" fired.

Additional corroborating evidence might be set forth, but the evidence already mentioned sufficiently disposes of appellant's claim that Call's testimony was not sufficiently corroborated.

In his closing brief, appellant proceeds to reargue the evidence, claiming that the "evidence presented was capable of a reasonable interpretation of appellant's innocence." His efforts in this regard are doomed by the rule that conflicts in the evidence will not be resolved anew on appeal.

Judgment affirmed. The purported appeal from order denying new trial is dismissed, such order being nonappealable.

Shoemaker, P. J., and Taylor, J., concurred.

A petition for a rehearing was denied October 30, 1968, and appellant's petition for a hearing by the Supreme Court was denied December 4, 1968. Traynor, C. J., and Peters, J., were of the opinion that the petition should be granted.